**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | **Chapter 11** |
| **MIDWEST CHRISTIAN VILLAGES, INC.** *et al.*,[1] | **Case No. 24-42473-659** **(Joint Administration Requested)** |
| **Debtors.** | Hearing Date: July 17, 2024 Hearing Time: 2:00 p.m. (CT) Hearing Location: Courtroom 7 |

**FIRST DAY DECLARATION OF KATHLEEN (KATE) BERTRAM**

The undersigned hereby declares under oath as follows:

1. I serve as President and Chief Executive Officer of each of the Debtors.

2. I joined the Debtors around March 2022 as COO. I have over 25 years of experience in the senior living industry. Before joining the Debtors, I held the Vice President of Operations position for Pathway to Living in Chicago since 2017.

3. While not currently providing board service, I have served on several boards of directors in the past including Argentum, Leading Age Illinois, and SL100 Advisory Board, and the State of Wisconsin Nursing Home Examiners Board.

---

[1] The address of the Debtors headquarters is 2 Cityplace Dr, Suite 200, Saint Louis, MO 63141-7390. The last four digits of the Debtors' federal tax identification numbers are: (i) Midwest Christian Villages, Inc. [5009], (ii) Hickory Point Christian Village, Inc. [7659], (iii) Lewis Memorial Christian Village [3104], (iv) Senior Care Pharmacy Services, LLC [1176], (v) New Horizons PACE MO, LLC [4745], (vi) Risen Son Christian Village [9738], (vii) Spring River Christian Village, Inc. [1462], (viii) Christian Homes, Inc. [1562], (ix) Crown Point Christian Village, Inc. [4614], (x) Hoosier Christian Village, Inc. [3749], (xi) Johnson Christian Village Care Center, LLC [8262], (xii) River Birch Christian Village, LLC [7232], (xiii) Washington Village Estates, LLC [9088], (xiv) Christian Horizons Living, LLC [4871], (xv) Wabash Christian Therapy and Medical Clinic, LLC [2894], (xvi) Wabash Christian Village Apartments, LLC [8352],(xvii) Wabash Estates, LLC [8743], (xviii) Safe Haven Hospice, LLC [6886], (xix) Heartland Christian Village, LLC [0196], (xx) Midwest Senior Ministries, Inc. [3401] and (xxi) Shawnee Christian Nursing Center, LLC [0068].

4.      I have a Bachelor of Science in Degree in Business Management from the University of Wisconsin-Milwaukee, a Master of Business Administration from Mount Mary University, and a Licensed Nursing Home Administrator license in the State of Wisconsin.

5.      I have personal knowledge of the facts set forth herein and if called, would testify regarding the same.

6.      I make this declaration for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of these Chapter 11 cases and in support of the First-Day Motions (as set forth below).

7.      The Debtors have requested various types of relief in a number of applications and motions (each a "<u>First Day Motion</u>" and collectively, the "<u>First Day Motions</u>").  The First-Day Motions seek relief intended to maintain the Debtors' business operations, to preserve value for the Debtors, its stakeholders and parties and interest; and most important, to protect the health and well being of the residents at the Debtors' facilities.

8.      Section I provides an overview of the Debtors and these Chapter 11 cases.  Section II provides a summary of the First-Day Pleadings and factual basis for the relief requested in those pleadings.

## I.

## <u>THE DEBTORS AND THEIR ASSETS</u>

### <u>Background Regarding the Business and the Facilities</u>

9.      Many of the Debtors have been in business for over 60 years providing senior living facilities and services as part of their Christian faith based not for profit mission.

10.    The Debtors operate a mix of independent, assisted and skilled nursing campuses in 10 locations across the Midwest, serving over 1,000 residents.  There is also a pharmacy business as discussed below.  Here is a listing and map of the current facilities:



11.    Certain of the Debtors[2] have entered into a Master Trust Indenture dated as of June 1, 2007 (as supplemented and amended from time to time, the "Master Indenture") with UMB Bank, N.A., as the successor master trustee (the "Master Trustee").  The Master Indenture authorizes the Members of the Obligated Group to issue Direct Note Obligations or other evidence of indebtedness (collectively, the "Obligations") in order to secure financing or refinancing of senior residential and health care facilities and for other lawful and proper corporate purposes.

---

[2] Christian Homes, Inc., Crown Point Christian Village, Inc., Hickory Point Christian Village, Inc., Hoosier Christian Village, Inc., Lewis Memorial Christian Village, Midwest Senior Ministries, Inc., New Horizons PACE MO, LLC, Risen Son Christian Village, Senior Care Pharmacy Services, LLC and Spring River Christian Village, Inc. (each a "Member of the Obligated Group" or "Member"  and collectively, the "Members of the Obligated Group" or "Members").

3

The Obligations are joint and several liabilities of the Members of the Obligated Group. From time to time, Christian Homes, Inc., on behalf of itself and on behalf of the other Members of the Obligated Group, as Obligated Group Agent, has issued Obligations to evidence and secure the Members' obligations relating to a number of financings, including bank and bond financings. In order to secure the payment of the Obligations, the Members of the Obligated Group have granted a security interest in favor of the Master Trustee in all Gross Revenues of the Members (as defined in the Master Indenture) and certain property of the Members (including mortgages on certain real property owned by Members.)

12.     As of July 15, 2024, approximately $75 million in principal amount of Obligations is outstanding. The outstanding Obligations were issued by the Obligated Group to secure the Obligated Group's obligations with respect to the following bonds:

- Illinois Finance Authority Revenue Refunding Bonds, Series 2016, outstanding in the aggregate principal among of $27,795,000, plus accrued interest;

- Health and Education Facilities Authority of the State of Missouri Senior Living Facilities Revenue Bonds, Series 2018, outstanding in the aggregate principal amount of $27,685,000, plus accrued interest;

- Illinois Financing Authority Revenue Bonds, Series 2021A, outstanding in the principal amount of $12,860,000, plus accrued interest;

- Illinois Financing Authority Revenue Bonds, Series 2021B, outstanding in the aggregate principal amount of $7,230,000, plus accrued interest.

13.     On or about June 10, 2024, the Trustee accelerated the Obligations and setoff amounts in Trustee-held funds and accounts against such accelerated Obligations.

Each of the series of Bonds has been issued under a separate bond indenture under which UMB Bank N.A. also serves as the successor bond trustee (in such capacity the "Bond Trustee" and sometimes referred to together with the Master Trustee as the "Trustee").

### Loans to the Non-Obligated Group

14.     There are four facilities not owned by a Member of the Obligated Group.

15.     Two of those facilities have financing from the United States Department of Housing and Urban Development ("HUD").

16.     Wabash Estates is located in Carmi, Illinois (White County). It is financed by a HUD-insured loan (FHA Project No. 072-22118) from ORIX Real Estate Capital, LLC, a Delaware limited liability company as successor by conversion and merger to Lancaster Pollard Mortgage Company, in the original principal amount of $4,800,000, and serviced by Lument. The loan originally closed on or about September 1, 2013 and will mature on October 1, 2048. On July 1, 2020, the loan documents were modified to reduce the interest rate (on a going forward basis) from 3.73% per annum to 2.95% per annum. Principal and interest payments in the amount of $18,664.45 are due monthly. The property is encumbered by a mortgage securing the loan and related HUD regulatory agreement and extended use agreement. Wabash Estates was initially a limited partnership but in 2024 was converted to an Illinois limited liability company following the exit of its limited partner.

17.     Washington Village Estates is located in Washington, Illinois (Tazewell County). It is financed by a HUD-insured loan (FHA Project No. 071-22235) from ORIX Real Estate Capital, LLC, a Delaware limited liability company, company as successor by conversion and merger to Lancaster Pollard Mortgage Company, in the original principal amount of $5,840,000, and serviced by Lument. The loan originally closed on or about September 1, 2013 and will mature

on October 1, 2048.  On July 1, 2020, the loan documents were modified to reduce the interest rate (on a going forward basis) from 3.73% per annum to 2.95% per annum.  Principal and interest payments in the amount of $24,920.82 are due monthly.  The property is encumbered by a mortgage securing the loan and related HUD regulatory agreement and extended use agreement. Washington Village Estates was initially a limited partnership but in 2024 was converted to an Illinois limited liability company following the exit of its limited partner.

18.     For the Wabash Estates and Washington Village Estates facilities, there will be no lien on the applicable segregated resident security deposits.  For these two facilities, the approximate security deposit amounts, currently held by the Debtors in separate bank accounts, are as follows:  $4,000.36 (Wabash Apartments) and $6,216.83 (Washington Village Estates).

19.     One of the other two remaining facilities outside the obligated group has mortgage debt.  Wabash Christian Village Apartments is located on property adjacent to Wabash Estates. The Wabash Christian Village Apartments property is additionally financed by a loan from the Illinois Housing Development Authority ("IHDA") in the amount of $425,000, which closed on or about December 20, 1995 and will mature on December 1, 2025.  The loan accrues interest at a rate of 0% per annum.  The entire amount of the loan is due at maturity. The property is encumbered by a mortgage securing the loan.

20.     A pharmacy operation was opened in 2004.  The pharmacy currently serves nearly all of the operating Debtors as clients as well as 11 communities/facilities outside of Christian Horizons.

21.     The Debtors head office is located at Two CityPlace Drive, 2nd Floor, St. Louis, Missouri.

22.     Certain other facilities and programs have been sold or closed previously, as noted below:

> **Johnson Christian Village Care Center**. Johnson Christian Village Care Center, LLC (outside of the Obligated Group) sold substantially all of the assets (including the real property) used in the operation of the senior living community known as "Johnson Christian Village Care Center" and located in Bedford, Indiana. The purchase price was $900,000 and the transaction closed on June 28, 2024.

> **PACE**:  On February 15, 2024, Midwest Christian Villages, Inc. sold all of its Membership Interests in Prime Acquisitions, LLC d/b/a New Horizons PACE for a purchase price of $2,500,000. On March 26, 2024, the real property and buildings upon which the New Horizons PACE conducted its operations was sold and net sale proceeds in the amount of $5,363,839.49 were deposited with the Master Trustee.

> **Wabash**.  Wabash Christian Village which was owned by Christian Homes was sold on December 1, 2023. Attached is the settlement statement from the closing. The sale price was $5,250,000. There was a $300,000 hold back. The statement shows $1,515,000 as a payoff to UMB as the Master Trustee. Note, however, that these funds were deposited into the project fund held by UMB to be used for alternate project capital project costs (such as the wastewater project in Iowa) and not used to paydown any of the bonds. The net proceeds of $3,229,044.50 were remitted to Christian Homes.

> **Safe Haven Hospice, LLC** – Safe Haven Hospice, LLC is no longer operating under the Debtors' control.

> **MCV Carelink, LLC** – MCV Carelink, LLC is no longer operating under the Debtors' control.

### Challenges Leading to these Chapter 11 Filings

23.     The senior living space, including the Debtors facilities, were significantly impacted by COVID-19.

24.     In addition, there have been material additional costs related to employee wages, agency staffing costs, increased food and other vendor costs and increased construction/capital expenditure costs.

25.     Below is a chart showing the consolidated financial performance of the Debtors from 2019 to 2024:

7

| Christian Horizons Consolidated Operating Performance | | | | | | |
|---|---|---|---|---|---|---|
| | Audited Year Ending 6/30/2019 | Audited Year Ending 6/30/2020 | Audited Year Ending 6/30/2021 | Audited Year Ending 6/30/2022 | Unaudited Year Ending 6/30/2023 | Unaudited Annualized 6/30/2024 |
| Net Operating Revenues[1] | 148,089,778 | 133,517,025 | 116,013,834 | 118,815,592 | 111,415,046 | 87,331,434 |
| Operating Expenses[2] | 139,943,031 | 130,168,161 | 119,674,000 | 124,389,868 | 128,647,517 | 102,831,423 |
| **EBITDA[3]** | 8,146,747 | 3,348,864 | (3,660,166) | (5,574,276) | (17,232,471) | (15,499,990) |
| Interest, Taxes & Depreciation | 13,465,917 | 11,873,062 | 11,813,357 | 11,722,195 | 13,553,884 | 12,119,606 |
| **Operating Loss[4]** | (5,319,170) | (8,524,198) | (15,473,523) | (17,296,471) | (30,786,355) | (27,619,596) |

[1]Includes service revenue, amortization of entrance fees, other operating revenue, and grant revenue from both current and discontinued operations; excludes gains on investments or divestitures.

[2]Excludes Interest, Taxes, Depreciation & Amortization, Goodwill impairment, losses on extinguishment of debt, losses on investments or disposal of assets.

[3]Earnings before Interest, Taxes, Depreciation and Amortization. EBITDA is a non-GAAP measurement.

[4]Operating Loss excluding Goodwill impairment, gains and losses from investments or disposal of assets, and non-operating contributions.

26.     The Debtors along with their financial consultant Healthcare Management Partners ("HMP") have developed an operations improvement plan which has been approved by the Debtors' board and is in the process of being implemented.

**Pre-Petition Marketing Efforts**

27.     Prior to filing the instant bankruptcy cases the Debtors engaged HMP as strategic advisors in assessing its business and strategic alternatives for continued operations and/or sales of a portion or all of its assets. HMP is a turnaround and consulting firm that specialized on assisting healthcare organizations experiencing financial challenges.  After consultation with HMP, the Debtors retained B.C. Zeigler and Company ("Zeigler") as investment bankers to assist it with locating potential buyers for some or all of its facilities.  Ziegler is a privately held investment bank, capital markets and proprietary investments firm that specializes in the healthcare, senior living and education sectors.

28.     The Debtors, with assistance from HMP and Zeigler, prepared marketing materials for the Debtors assets in April 2024.  Beginning in May 2024, it solicited interest by the most

likely potential buyers (approximately 50) for the Debtors' assets either individually, in groups or for all facilities.  As of the date of the filing of this motion, 35 different parties of those solicited signed NDAs and have been provided more detailed information via a data room set up by Zeigler for the parties who have executed NDAs to be able to conduct their due diligence.  As of the date of the filing of this motion, 7 letters of intent have been received.

29.    That same data room as supplemented and updated will be used for any additional potential buyers who are identified and execute an appropriate NDA during the course of the further marketing under the Sales Procedures and Sale Approval Motion.

30.    The Debtors and its advisors are continuing to market the assets to a broader group of potential buyers after the filing of this case pursuant to the following timetable:

| | |
|---|---|
| September 19. 2024 | Deadline to Submit Stalking Horse Bids |
| September 23, 2024 | Selection of Stalking Horse |
| November 7, 2024 | Deadline to Provide Overbid to Stalking Horse |
| November 12, 2024 | Auction if Overbids are Submitted |
| On or about November 14, 2024 | Sale Hearing |

## II.

## FACTS IN SUPPORT OF THE FIRST DAY MOTIONS

31.    The Debtors have filed various pleadings seeking first day relief to continue to run their businesses as a going concern.  I have reviewed and approved those pleadings.  In particular, I state the following key facts in support of the relief sought.

**Administrative Motions**

### i.    Joint Administration of the Chapter 11 Cases

32.    In the Joint Administration Motion, the Debtors seek the standard relief of seeking to have their 21 chapter 11 cases jointly administered under a single lead case number and docket. Many of the motions, hearings, and orders in these cases will affect each and every Debtor.  Joint administration of these chapter 11 cases therefore will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings.  Joint administration will also allow the United States Trustee for the Eastern District of Missouri and all other parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

### ii.    Motion to Extend Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs

33.    While the Debtors, with the help of their professional advisors, are working diligently and expeditiously on the preparation of the Schedules and Statements, resources have been attenuated.  Not only have the same employees with the expertise to complete the Schedules and Statements been focused on the commencement of the Chapter 11 Cases, they have also been significantly occupied by numerous other restructuring workstreams.  The Debtors' claims and noticing agent was recently engaged and will be assisting on preparation of the Schedules and Statements.

34.     Due to the quantity of work necessary to complete the Schedules and Statements and the competing demands upon the Debtors' employees and professionals to assist in matters critical to the Debtors' reorganization efforts, the Debtors will not be able to properly and accurately complete the Schedules and Statements within the required fourteen (14) day time period.

35.     At present, the Debtors anticipate that they will require at least thirty-one (31) additional days to complete their Schedules and Statements. The Debtors therefore request that the Court extend the fourteen (14) day time period for an additional thirty-one (31) days, up to and including August 30, 2024 without prejudice to the Debtors' right to seek further extensions.

### iii.     Motion to Seal Personal Information

36.     By the Motion to Seal Personal Information, the Debtors seek entry of an order (i) authorizing the Debtors to file under seal certain personal identification information residents, beneficiaries of residents, sole proprietor suppliers/vendors, and employees which would appear on the Creditor Matrix and the Schedules and Statements, as well as any other documents which may from time to time be necessary to file in these chapter 11 cases and (ii) granting related relief.

37.     The Debtors are seeking leave to file the confidential personal information of residents, beneficiaries of residents, sole proprietor supplies/vendors, and employees under seal. The information to be filed under seal includes identifying information of patients and residents, beneficiaries of residents, sole proprietor supplies/vendors, and employees including, but not limited to, names and home addresses of all such parties ("Personal Information").

38.     The Debtors serve more than 1,000 residents in their skilled nursing campuses across the Midwest. Accordingly, the Debtors' operations generally must comply with Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

11

39.     The Privacy Rule protects all individually identifiable health information, which includes information such as the names or addresses of current or former patients. Thus, HIPAA's requirements to protect the privacy and security of protected health information require that the names and addresses of current and former patients not be publicly disclosed.

40.     In addition to patient information covered under the Privacy Rule, the Debtors also serve individuals who are not covered under the Privacy Rule, but whose names and addresses should, nevertheless, be considered confidential.  The beneficiaries of each of the residents, some of whose names could appear in various places in the Creditor Matrix, Schedules, SOFA, and other papers field in this case is also confidential personal information as are the name and home addresses of and sole proprietors who may supply supplies or services to the Debtors.  Finally, the Debtors employ over 960 individuals, each of whose name and home address is personal information and not necessary to disclose to the general public in these cases.

41.     The Debtors believe good cause exists to permit them to file certain portions of the Creditor Matrix, the Schedules and Statements, and SOFA under seal to protect the Personal Information.

**Operations Related Motions**

**iv.     Motion Related to Employee Wages and Benefits**

42.     By the Employee Wage Motion, the Debtors seek entry of an interim order and, pending a final hearing on the relief requested herein, a final order pursuant to §§ 105(a), 363(b), and 507(a) the Bankruptcy Code, and subject to the DIP Budget, for (I) authority to (a) pay Employee Compensation Obligations and Employee Benefit Obligations and related expenses, fees, and costs incident to the foregoing, including amounts owed to third-party service providers and administrators and tax authorities, and (b) maintain, continue to honor, and pay amounts with

respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the commencement of these chapter 11 cases and as such may be modified or supplemented from time to time in the ordinary course of business ((a) and (b) collectively, the "Employee Obligations"); and (II) related relief.

**A.      Employee Compensation Obligations**

43.      The outstanding amounts related to employee compensation (the "Employee Compensation Obligations") are summarized in the following chart and are described in further detail below:

| Prepetition Obligations | Description | Total Relief Requested |
|---|---|---|
| Base Compensation Obligations | Obligations related to Employees' salaries and wages, including, for certain employees, overtime pay | $1,348,500 |
| UKG | Fees owed to UKG for payroll processing software and UKG Payment Services for preparing and filing employment tax documents. | $68,900 |
| Gross Pay Deductions, Governmental Withholdings and Payroll Taxes | Wage-based taxes owing pursuant to applicable federal and local laws | $522,583 |
| **Total Employee Compensation Obligations ($)** | | **$1,939,983** |

*i.      Base Compensation*

44.      In the ordinary course of business, the Debtors incur and pay obligations relating to Employees' salaries and wages, and for certain Employees, overtime pay (the "Base Compensation Obligations").

45.      The Debtors pay Base Compensation Obligations to Employees on different payroll schedules, in arrears on two separate bi-weekly payroll cycles.  On average, the Debtors' Base

13

Compensation Obligations total approximately $3.6 million per month.  The Debtors process payroll internally through software provided by UKG (as discussed below).

46.     The Debtors estimate that as of the Petition Date, they owe approximately $1,348,500 on account of prepetition Base Compensation Obligations. The Debtors seek authority to pay such prepetition amounts as they come due in the ordinary course, up to $15,150 per Employee (the "$15,150 Cap"),[3] subject to the DIP Budget.

47.     The next payroll needs to be funded on Thursday, July 18, 2024 in order to be disbursed to the employees by Friday, July 19, 2024.

### ii.     Payroll Servicer

48.     To manage the processing and payment of the various obligations described above efficiently (the "Payroll Maintenance Fees"), the Debtors rely on payroll software provided by UKG Inc. ("UKG").

49.     The services that UKG provides are critical to the smooth functioning of the Debtors' payroll system. UKG is responsible for ensuring, that: (i) Employees are paid on time, (ii) appropriate deductions are made, (iii) payroll reporting is accurate, and (iv) appropriate amounts are reported and remitted to the applicable taxing authorities and other payees.  The Debtors pay UKG approximately $85,000 per quarter, in the aggregate, for the aforementioned services.  As of the Petition Date, the Debtors owe UKG approximately $68,900 on account of prepetition Payroll Maintenance Fees.  The Debtors seek authority to pay all Payroll Maintenance Fees in the ordinary course, including all prepetition fees, in accordance with the DIP Budget.

---

[3]     The Debtors seek to pay each Employee up to $15,150, in the aggregate, on account of wages and salaries, including vacation, or contributions to an employee benefit plan earned within 180 days before the Petition Date.

### iii.    Gross Pay Deductions, Governmental Withholdings and Payroll Taxes

50.     For each applicable pay period, the Debtors routinely deduct certain amounts from each Employee's gross pay including, without limitation, garnishments, child support, spousal support, other deductions as required by applicable law, service charges, and other pre- and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, including each Employee's share of health benefit plans, contributions under flexible spending plans, health savings accounts, retirement savings plans, and other miscellaneous deductions (collectively, the "Deductions").[4]    The Debtors make a total of approximately $191,080 in Deductions from Employees' pay per month, which the Debtors remit, as necessary, to the appropriate third-party recipients.

51.     In addition to the Deductions, state and federal law requires the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, including Social Security and Medicare taxes, for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withholdings").    The Debtors must then match, from their own funds, amounts for Social Security and Medicare taxes and pay additional amounts for federal and state unemployment insurance based on claims made (collectively the "Employer Payroll Taxes," and together with the Withholdings, the "Payroll Taxes").    In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $995,271 per month.

52.     As of the Petition Date, the Debtors estimate that they owe approximately $522,583, in the aggregate, in accrued Payroll Taxes and Deductions.    In addition to UKG's payroll services described above, the Debtors also use UKG Payment Services to prepare and submit

---

[4]    Certain of the Deductions, particularly with respect to the Health Benefits Programs, FSAs, and HSAs (each, as defined below) are discussed further below in connection with the Employee Benefit Obligations.

15

employment tax filings. As such, the Debtors request authority, subject to the DIP Budget, (i) to direct UKG Payment Services to pay or remit any outstanding prepetition taxes on a postpetition basis as the taxes come due and (ii) to continue to honor and process, or to direct UKG Payment Services to process Payroll Taxes and Deductions on a postpetition basis, in the ordinary course of business and consistent with prepetition practices (whether or not related to the prepetition period).

**B.**     ***Employee Benefit Obligations***

53.     In the ordinary course of business, the Debtors make various benefit plans available to their Employees. These benefit plans fall within the following categories: (i) paid time off, including personal time off and holidays (collectively, the "Employee Leave Benefits"); (ii) medical, dental, vision, and prescription drug benefits, flexible spending accounts and health savings accounts, health reimbursement arrangement plans, life insurance, accidental death and dismemberment insurance ("AD&D"), disability insurance, (collectively, the "Health and Welfare Benefits"); (iii) an ERISA 403(b) retirement plan; and (iv) certain other benefits (each of (i)-(iv), an "Employee Benefit").

54.     The prepetition obligations arising from the Employee Benefits (the "Employee Benefit Obligations") are summarized in the following chart and are described in further detail below:

| Prepetition Obligations | Description | Total Relief Requested |
|---|---|---|
| Employee Leave Benefits | Obligations related to Employee paid time off and related benefits | $117,000 |
| Health and Welfare Benefits | Obligations related to medical benefits, disability benefits, and other health and welfare programs | $416,137 |
| ERISA 403(b) Retirement Plan | Obligations related to the 403(b) Plan | $0 |
| Other Benefits | Obligations related to miscellaneous benefits, including general employee assistance, identity theft protection and tuition reimbursement | $107,500 |
| **Total Employee Benefit Obligations ($)** | | **$640,637** |

#### i.     *Employee Leave Benefits*

55.     The Employee Leave Benefits available to Employees may vary slightly by state to comply with all applicable state laws. As part of the Employee Leave Benefits, the Debtors offer certain paid leave to all Employees, which include, among other things, PTO (as defined below), employee and family sick leave, holidays, bereavement leave, child bereavement leave, jury duty, and military service leave.  The Debtors also provide up to twelve (12) weeks unpaid leave to all Employees pursuant to the federally-mandated Family and Medical Leave Act.  In addition, the Debtors offer Employees to request unpaid leaves of absence which may be granted at the discretion of the Executive Director/Administrator in accordance with the Debtors' personal leave of absence policy.

56.     Non-temporary Employees are eligible to accrue paid time off ("PTO"), which accrues throughout the year based on actual hours worked.  PTO can be carried over from year to year and with no maximum amount of PTO hours that Employees may accrue and carry.

Employees are paid for any unused accrued PTO at the time of termination. Employees are also paid accrued unused PTO upon a request to "sellback" PTO if such request was made during the current calendar year provided that the Employee submitted an intention to request a sellback by December 31 of the year prior to the sellback. Employees requesting a sellback must maintain a minimum of 40 hours in their PTO account and Employees hired during the current calendar year are not permitted to sellback PTO. No payments will otherwise be made to Employees based on accrued PTO.

57.     In addition to being required by Company policy, payments on account of PTO are required by law in some states in which the Debtors operate.

58.     As of the Petition Date, the Debtors estimate that they owe approximately $117,000 to Employees on account of PTO obligations. The Debtors seek authority to make payments on account of PTO to employees up to the $15,150 Cap and only after approval of this Motion on a final basis and subject to the DIP Budget.

59.     As of the Petition Date, active Employees have accrued approximately $1.7 million in unused PTO. The Debtors anticipate that they may owe PTO pay to Employees pursuant to reductions-in-force that may be implemented postpetition and postpetition requests to sellback PTO, and seek authority to assess and pay those amounts in accordance with past practice, but only up to the $15,150 Cap for prepetition services and, for postpetition services, to the extent those claims are entitled to administrative expense treatment under § 503(b)(1) of the Bankruptcy Code. The Debtors seek authority to pay such amounts only after approval of this Motion on a final basis and subject to the DIP Budget.

ii.      *Health and Welfare Benefits*

60.      The Debtors provide several Health and Welfare Benefits to eligible Employees. The Health and Welfare Benefits include: medical, vision, and dental programs (each, a "Health Benefits Program"); flexible spending accounts, health saving accounts, health reimbursement arrangement plans, and other voluntary welfare programs (collectively, the "Additional Health Benefits"); and disability benefits, AD&D, and life insurance benefits, (collectively, the "Disability Benefits").

a)      *Health Benefits Programs*

61.      The Debtors offer the following Health Benefits Programs, which are administered and insured through Anthem Blue Cross Blue Shield ("Anthem") effective July 1, 2024 to enrolled Employees and their families.   Prior to July 1, 2024, the Health Benefits Programs were administered by Aetna Life Insurance Company ("Aetna").   Anthem is a preferred provider organization under which improved benefits are available when using a doctor, dentist, or other healthcare provider within a network of preferred providers.

62.      Medical Program.  The Debtors offer eligible Employees medical coverage (the "Medical Program"), which is fully insured by Anthem effective July 1, 2024 and prior to July 1, 2024 was fully insured through Aetna.  The Debtors pay a portion of premiums owed to Anthem with the Employees paying the remaining portion of premiums and their share of copays and deductibles to Anthem on account of services rendered to them.  The current monthly amount of premiums paid by the Debtors is approximately $389,611 and the current monthly amount of premiums paid by the Employees is approximately $81,864.  As of the Petition Date, the Debtors are current with the amount of premiums owed to Anthem and owes Aetna $412,642.

63.   <u>Dental Program.</u>  The Debtors offer eligible Employees dental coverage (the "<u>Dental Program</u>"), which is fully insured by Anthem effective July 1, 2024 and prior to July 1, 2024 was fully insured through Aetna.   Employees pay 100% of premiums under the Dental Program. Premiums for the Dental Program are deducted from participating Employees' payroll, and then transferred by the Debtors to Anthem on behalf of the Employees.  The Debtors transfer approximately $13,675 per month in withheld Employee contributions to Anthem.  As of the Petition Date the Debtors estimate they owe approximately $12,285 to Aetna on account of the Dental Program.  This outstanding amount is included in the total amount for Deductions, provided above.

64.   <u>Vision Program.</u>   The Debtors offer all eligible Employees voluntary vision coverage (the "<u>Vision Program</u>") through Anthem effective July 1, 2024 with coverage prior to July 1, 2024 provided through Aetna.  The Vision Program is fully insured, and Employees pay 100% of premiums. Premiums for the Vision Program are deducted from participating Employees' payroll, and then transferred by the Debtors to Anthem on behalf of the Employees.  The Debtors transfer approximately $1,930 per month in withheld Employee contributions to Anthem.  As of the Petition Date the Debtors estimate they owe approximately $1,930 to Aetna on account of the Vision Program.  This outstanding amount is included in the total amount for Deductions, provided above.

65.   <u>COBRA.</u>   Under COBRA, Employees who are terminated have the right to continue health benefits from their employer for a limited period of time and under certain circumstances.  The Debtors provide COBRA benefits to exiting Employees as required by law. The Debtors' COBRA program is administered by Employee Benefits Corporation ("<u>EBC</u>"). Upon termination of an Employee qualified for COBRA coverage, the Debtors inform EBC, EBC

then notifies the terminated Employee of his or her rights, determines if he or she wishes to continue coverage, collects COBRA premiums from the terminated Employee and remits them to the Debtors, and furnishes the Debtors with reports of its activities.  In exchange for administration of the Debtors' COBRA program, EBC retains an ongoing service fee of $0.61 per enrollee and 2% of the COBRA premiums collected.  These obligations owed to EBC total approximately $250 per month.  The Debtors seek authority to pay prepetition amounts owed under COBRA, and to continue providing COBRA benefits in the ordinary course, subject to the DIP Budget.

### b)       *Disability Benefits Programs*

66.       The Debtors provide additional health benefits to their Employees under various policies and programs, in some cases automatically and in others upon election by a particular eligible Employee.

67.       <u>HSA and HRA Programs</u>.  The Debtors provide the option for eligible Employees to maintain either a health savings account ("<u>HSA</u>") or health reimbursement arrangement plan ("<u>HRA</u>," and together with the HSA, the "<u>Health Accounts</u>") to pay for qualified health, dental, and vision expenses.  The HSAs and HRAs are managed by EBC.  The Debtors contribute $500 for Employees and $1,000 for Employees and their families to an Employee's HSA.  The Debtors also contribute $200 for Employees and $400 for Employees and their families to an Employee's HRA.  Employees may make pre-tax contributions to their HSAs, but not to their HRAs.

68.       The Debtors also pay administrative and management fees of approximately $810.85 per month, in the aggregate, to EBC on account of its services.  As of the Petition Date, the Debtors are current with amounts owed to EBC.

69.       <u>Flexible Spending Accounts</u>.  The Debtors also provide Employees the option to contribute to two types of flexible spending accounts (the "<u>FSAs</u>"), which are administered by

21

EBC.  The health care FSA ("HCFSA") allows Employees to make pre-tax payroll deductions to pay for qualified medical, pharmacy, dental and vision expenses.  The dependent care FSA ("DCFSA") allows Employees to make pre-tax payroll deductions to pay for eligible day care or elderly care expenses. If an Employee is terminated, any balance remaining in her FSA(s) is lost.[5] Furthermore, any balance remaining in the FSAs at the end of each plan year is lost. The Debtors do not make contributions to the FSAs.  The Debtors pay EBC administrative fees of approximately $3.30 per participating Employee per month for its administrative services related to the FSAs.  As of the Petition Date, the Debtors are current with amounts owed to EBC.

70.     _Voluntary Worksite Benefits_.  The Debtors offer Employees certain voluntary benefits to cover unforeseen out-of-pocket expenses associated with certain unexpected occurrences ("Voluntary Worksite Benefits") through Anthem effective July 1, 2024 and through Aetna prior to July 1, 2024.  Critical illness insurance provides Employees with a lump-sum payment for many conditions, such as invasive cancer, heart attack, stroke, end-stage renal failure, coma, major organ failure requiring a transplant, and permanent paralysis.  Accident coverage pays cash to help with out-of-pocket expenses when an accident occurs.  Hospital indemnity insurance pays a specified amount when an individual is confined to a hospital.  Employees pay 100% of the premium on a post-tax basis for Voluntary Worksite Benefits.  Premiums for Voluntary Worksite Benefits are deducted from participating Employees' payroll, and then transferred by the Debtors to Anthem on behalf of the Employees.  The Debtors transfer approximately $4,920 per month in withheld Employee contributions to Anthem effective July 1, 2024 and Aetna for coverage prior to July 1, 2024 in connection with Voluntary Worksite Benefits.  As of the Petition Date, the Debtors are current on amount owed in respect of the Voluntary Worksite Benefits with Anthem.

---

[5] An Employee may continue to use the HCFSA if the Employee elects COBRA and continues to make after-tax contributions to the FSA.

As of the Petition Date the Debtors estimate they owe approximately $5,120 to Aetna on account of the Voluntary Worksite Benefits. This outstanding amount is included in the total amount for Deductions, provided above.

### c)    *Disability Benefits Programs*

71.    The Debtors offer certain types of insurance or other benefit plans to eligible Employees under various policies and programs, in some cases automatically and in others upon election by a particular eligible Employee. The chart below outlines the available programs and specifies which Employees are eligible and whether those programs are paid by the Debtors or funded through Employee contributions:

| Type of Benefit | Provided by Debtors/Voluntary |
| --- | --- |
| Basic Life and AD&D | Provided by Debtors |
| Supplemental Life and AD&D | Voluntary |
| Short-Term Disability | Voluntary |
| Long-Term Disability | Provided by Debtors |
| Voluntary Long-Term Disability | Voluntary |

72.    <u>Basic Life and AD&D</u>. The Debtors provide eligible Employees with basic life insurance and AD&D insurance coverage ("<u>Basic Life and AD&D Insurance Plans</u>"), which is fully insured by New York Life. The Debtors pay 100% of premiums totaling approximately $3,050 per month. As of the Petition Date, the Debtors estimate that they owe approximately $2,850 to New York Life on account of the Basic Life and AD&D Insurance Plans. The Debtors seek authority to pay such amounts, subject to the DIP Budget.

73.    <u>Supplemental Life Insurance Plans</u>. All eligible Employees can elect to purchase life insurance coverage for their spouses and/or children, as well as purchase additional life and AD&D insurance coverage for themselves (collectively, the "<u>Supplemental Life Insurance</u>

Plans"), at their own expense.  The Supplemental Life Insurance Plans are fully insured by New York Life, and Employees pay 100% of premiums.  Premiums for the Supplemental Life Insurance Plans are deducted from participating Employees' payroll, and then transferred by the Debtors to New York Life on behalf of the Employees.  The Debtors transfer approximately $8,270 per month in withheld Employee contributions to New York Life in connection with the Supplemental Life Insurance Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $7,212 in respect of the Supplemental Life Insurance Plans; this amount is included in the total amount for Deductions, provided above.

74.     Short Term Disability.   All eligible Employees can elect to purchase salary continuation or short-term disability coverage (the "Short-Term Disability Plan"), at their expense. The Short-Term Disability Plan is fully insured by New York Life.   Under the Short-Term Disability Plan, eligible Employees receive 60% of their weekly earnings, for a maximum benefit of $2,500 per week, for up to 12 weeks.  Premiums for the Short-Term Disability Plan are deducted from participating Employees' payroll, and then transferred by the Debtors to New York Life on behalf of the Employees.   The Debtors  transfer approximately $3,970 per month to New York Life on account of the Short-Term Disability Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $3,970 to New York Life on account of the Short-Term Disability Plan; this amount is included in the total amount for Deductions, provided above.

75.     Long-Term Disability.   The Debtors provide eligible Employees with long term disability insurance coverage (the "Long-Term Disability Plan"), which is a fully-insured plan with New York Life.  The Debtors pay 100% of premiums related to the Long-Term Disability Plan.  Under the Long-Term Disability Plan, beginning on the 91st day of continuous injury or illness, eligible Employees will receive 60% of their monthly earning for a maximum benefit of

$6,000 per month.  The Debtors pay approximately $645 per month to New York Life on account of the Long-Term Disability Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $645 on account of the Long-Term Disability Plan.  The Debtors seek authority to pay such amounts, subject to the DIP Budget.

76.    <u>Voluntary Long-Term Disability</u>.  For those Employees not eligible for the Long-Term Disability Plan provided by the Debtors, the Debtors offer Employees the option to participate in a voluntary long-term disability plan (the "<u>Voluntary Long-Term Disability Plan</u>"), at their own expense.  The Voluntary Long-Term Disability Plan is fully insured by New York Life, and Employees pay 100% of premiums. Premiums for the Voluntary Long-Term Disability Plan are deducted from participating Employees' payroll, and then transferred by the Debtors to New York Life on behalf of the Employees.  The Debtors transfer approximately $3,875 per month in withheld Employee contributions to New York Life in connection with the Voluntary Long-Term Disability Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $3,360 in respect of the Voluntary Long-Term Disability Plan; this amount is included in the total amount for Deductions, provided above.

### iii.    Other Benefits and Obligations

77.    <u>EAP Program</u>. The Debtors provide all Employees access to an employee assistance program (the "<u>EAP</u>"), which is administered by ComPsych. State law requires that the Debtors offer Employees EAP.  *See* 210 ILCS 9/77.  The EAP offers Employees and their immediate family members caring and professional assistance for a range of concerns, including stress management, depression and anxiety, relationship or family conflicts, workplace conflicts, legal or financial difficulties, and drug or alcohol abuse.  The Debtors pay ComPsych

approximately $3,900 quarterly to maintain the EAP. As of the Petition Date, no amounts are outstanding in respect of these programs.

78.  <u>Value-Add Offerings</u>.  The Debtors also offer Employees financial, legal and estate support in the form of professional services to assist Employees with issues like debt management, family budgeting, estate planning, law and tax consultations.  These services are offered by ComPsych and New York Life, and also help Employees' health claims and billing issues and also provide advice with respect to pre-trip planning and travel support.

79.  <u>Identity Theft Protection</u>.  The Debtors also provide their Employees access to identity theft protection offered through LifeLock Benefit Elite (the "<u>Identity Theft Program</u>"). Employees make monthly payments for the Identity Theft Program and such payments are deducted from participating Employees' payroll, and then transferred by the Debtors to LifeLock on behalf of the Employees. The Debtors transfer approximately $565 per month in withheld Employee contributions to Life Lock, any outstanding amounts of which are included in the total amount for Deductions, provided above.

80.  <u>Tuition Reimbursement</u>.  The Debtors also offer certain full-time Employees tuition reimbursement for courses directly related to the Employee's present position, or part of a job-related degree or program.  As of the Petition Date, the Debtors estimate that they owe approximately $2,500 to Employees as tuition reimbursement.  The Debtors seek authority to pay such amounts, subject to the DIP Budget.

81.  <u>Corporate Credit Card Program</u>.  Employees pay for a majority of reimbursable expenses they incur through a combination of commercial card accounts and related contractual arrangements with JPMorgan & Chase Co. ("<u>JPMorgan</u>").

82.     The Debtors provide JPMorgan corporate cards (the "Corporate Credit Cards") to fewer than 15 Employees pursuant to a corporate account agreement with JPMorgan for ordinary course expenses they incur in performing their job functions.  Corporate Credit Cards are used by Employees to charge business-related related travel expenses and emergency community expenses.  It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for such expenses.  On average, the Debtors pay approximately $100,000.00 per month to JPMorgan for amounts incurred on the Corporate Credit Cards that are submitted for reimbursement to the Debtors.

83.     As of the Petition Date, the Debtors believe they owe approximately $105,000 on account of the Corporate Credit Cards.   Subject to the DIP Budget, the Debtors request authorization to pay all outstanding prepetition amounts incurred on account of the Corporate Credit Cards and to continue paying all outstanding amounts incurred on account of the Corporate Credit Cards postpetition in the ordinary course of business and consistent with their prepetition practices.

### iv.     ERISA 403(b) Retirement Plan

84.     The Debtors offer eligible Employees the opportunity to participate in an ERISA 403(b) retirement plan (the "403(b) Plan").  Under the 403(b) Plan, Employees can make pretax and/or post-tax ROTH contributions up to the IRS calendar year dollar limit, which is $23,000 for 2024 (the "403(b) Employee Contributions").[6]   Each eligible Employee's 403(b) Employee Contributions are deducted automatically from his or her paychecks.

---

[6] Employees over the age of 50 may make an additional catch-up contribution of $7,500 during the calendar year.

85.     The Debtors transfer approximately $49,500 per month on account of withheld 403(b) Employee Contributions. As of the Petition Date, there are no amounts outstanding.

86.     The 403(b) Plan is administered by Ascensus.   The fees of Ascensus are approximately $765 per calendar quarter.   The 403(b) Plan participants fund the administrative fees through quarterly charges to their 403(b) Plan accounts.   As of the Petition Date, the Debtors do not owe any outstanding amounts on account of the administrative, audit, legal, investment management and oversight fees for the 403(b) Plan (the "403(b) Administration Fees").

87.     By this Motion, the Debtors seek authority to continue the 403(b) Plan and to pay the 403(b) Employee Contributions and the 403(b) Administration Fees in respect of the 403(b) Plan thereunder as they come due in the ordinary course of business.   Although the Debtors expect the 403(b) Administration Fees to be funded by the 403(b) Plan participants, in accordance with past practice, to the extent they are not, the Debtors seek authority to pay such amounts, subject to the DIP Budget.

**v.     Motion to Continue Insurance Programs**

88.     By this Insurance Motion, pursuant to §§ 105, 361, 362, 363, and 364, the Debtors seek authority to pay and perform all obligations arising under their existing insurance policies, including any Premium Financing Obligations and Surety Bond Obligations (each, as further defined herein), whether arising pre-petition or post-petition, in the ordinary course of business consistent with past practice and in accordance with the budget attached as Exhibit 1 (as may be amended, modified, or supplemented, the "DIP Budget") to the *Interim Order (1) Authorizing Debtors in Possession to Obtain Post-Petition Financing; (2) Authorizing Debtors in Possession to Use Cash Collateral; (3) Providing Adequate Protection; (4) Granting Liens, Security Interests and Superpriority Claims; and (5) Scheduling a Final Hearing* (the "Interim DIP Order"), to

continue and as applicable, renew their insurance policies and related premium financing arrangements and their Surety Bond Program.

89.   The Debtors maintain various insurance policies issued by several insurance carriers (collectively, the "Insurance Carriers").  Collectively, these policies provide for coverage for, among other things: workers' compensation, D&O liability, general liability, professional liability, commercial property, commercial automobile, cyber liability, pollution liability, crime, fiduciary liability, and employment practices liability (collectively, the "Insurance Policies").  A schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit A.

90.   Continuation of the Insurance Policies is essential to the operation and preservation of the value of the Debtors' business, properties and assets.  The Debtors, as employers and operators of independent, assisted, and supportive living skilled nursing campuses across the Midwest, must maintain workers' compensation insurance coverage.  *See, e.g.*, (820 ILCS 305/1) (from Ch. 48, par. 138.1) (requiring workers' compensation coverage).  Also, as a practical and legal matter, the Debtors cannot provide patient care and continue to operate a skilled nursing system without professional and general liability insurance, among other coverages.

91.   As set forth in Exhibit A, most of the Debtors' Insurance Policies will expire between January 1, 2025 and June 30, 2025.  It is critical that the Debtors continue to carry the necessary insurance coverage to operate their business.  As a result, the Debtors plan to negotiate renewals, extensions and/or entries into new insurance policies with respect to the expiring Insurance Policies.  The Debtors seek the authority to renew, modify, extend or enter into new Insurance Policies (collectively, the "New Insurance Policies") on a postpetition basis in the ordinary course of business.

92.     In certain instances, the Debtors pay premiums for their Insurance Policies in full at the beginning of the policy and in other instances in monthly or quarterly installments.  The total annual premium due for Insurance Policies is approximately $2,788,668.60.  As of the Petition Date, there are no outstanding unpaid premiums due.

93.     To ensure continued insurance coverage in the ordinary course of the Debtors' business, the Debtors seek the authority to pay all premium payments that may come due on current Insurance Policies during the course of these Chapter 11 Cases, subject to the DIP Budget.  The Debtors also seek authority to pay all premiums associated with the New Insurance Policies on a postpetition basis in the ordinary course of business, subject to the DIP Budget.

94.     The Debtors finance payments of premiums due under certain of their Insurance Policies pursuant to a Premium Finance Agreement.  These annual premiums total approximately $1,387,625.60.  This amount of premiums has been financed and paid in full for next year under the Premium Finance Agreement.

95.     The Debtors make monthly payments under the Premium Financing Agreement.  Under the Premium Finance Agreement with IPFS Corporation, the Debtors pay $118,540.42 per month to finance $1,387,625.60 of total premiums owed under certain Insurance Policies.

96.     As of the Petition Date, there are no outstanding unpaid premiums due or payments due under the Premium Finance Agreement (the "Premium Financing Obligations").

97.     To ensure continued insurance coverage in the ordinary course of the Debtors' business, the Debtors seek the authority to pay any outstanding Premium Financing Obligations, subject to the DIP Budget.

98.     The Debtors maintain self-insured retentions of $250,000 per claim under their GLPL coverage, $250,000 per claim under their Property liability coverage, $100,000 per claim

under their D&O liability coverage, $100,000 per claim under their EPL coverage, and $25,000 per claim under their crime coverage (the "Self-Insured Retentions" or "SIRs").  An SIR is a loss amount that the insured is obligated to pay before the insurer's coverage obligation is triggered.

99.     The Debtors' Self-Insured Retentions are administered so that the Debtors pay directly for the losses under each policy as they are incurred up to the amounts of the Self-Insured Retentions.  For the last year, no SIR amounts have been due for (a) the D&O liability coverage and (b) the crime coverage.  The Debtors seek authority to pay all losses incurred up to the amounts of the Self-Insured Retentions as such amounts have come due prepetition or will come due on a postpetition basis in the ordinary course of business, subject to the DIP Budget.

100.     Propel Insurance (the "Insurance Broker") serves as the Debtors' insurance broker for the Insurance Policies and related programs other than policies providing coverage for general liability and professional liability.  The Insurance Broker is compensated for its services through either commissions from the relevant Insurance Carriers or payment by the Debtors of a set percentage of the policy premium reduced by any related commissions the Insurance Broker receives from such Insurance Carriers.  The Insurance Broker must disclose any commissions collected to the Debtors.  To the best of the Debtors' knowledge, they do not owe any prepetition fees to the Insurance Broker.

101.     Pursuant to their surety bond program (the "Surety Bond Program"), in the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties (the "Obligees"), including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with resident trust funds, and certain other obligations (the "Surety Bonds"), including, but not limited to those listed on Exhibit B

hereto. The Surety Bonds are issued by Swiss Re Corporate Solutions America Insurance Company and CNA Surety (each, a "Surety").

102.    Pursuant to the Surety Bond Program, the Debtors pay premiums based upon a fixed rate established and billed by each Surety (collectively, the "Surety Premiums"). The Surety Premiums are generally determined on an annual basis and total in the aggregate approximately $9,800 per year (the "Surety Bond Obligations"). The Debtors remit premium payments when the bonds are issued or renewed on an annual basis. The Debtors estimate that no Surety Bond Obligations are outstanding as of the Petition Date. By this Motion, the Debtors seek authority, but not direction, to pay such Surety Bond Obligations that may become due and owing during these chapter 11 cases, subject to the DIP Budget.

103.    As a condition to issuing the bonds, the Sureties require that the Debtors enter into indemnity agreements (collectively, the "Indemnity Agreements"), pursuant to which the Sureties are indemnified from any loss, cost, or expense that the Sureties may incur on account of the issuance of any bonds on behalf of the Debtors. Pursuant to certain contracts between the Debtors and the Sureties, the Sureties may demand cash collateral or letters of credit to secure the obligations under surety bonds at any point during the time the Surety Bonds remain outstanding. As of the Petition Date, the Debtors have not yet posted any cash collateral or letters of credit in connection with the Surety Bonds.

**vi.    Motion to Maintain Existing Bank Accounts and Business Forms**

104.    As set forth in the Cash Management Motion, the Cash Management System currently comprises approximately eighty-nine (89) accounts (the "Accounts"), with fourteen (14)

commercial banks, one (1) title company, one (1) senior care investment and asset management firm, and one (1) retirement financial advisory firm (collectively the "Banks").[7]

105.    From a broad perspective, under the cash management system each resident community has their own deposit account.  Those deposit accounts are zero balance accounts and sweep each night either into the Christian Homes Inc. Concentration Account or the Midwest Christian Village Account.

106.    If a location is part of the "Obligated Group" (i.e. subject to the Bondholder's claims), it sweeps into the Christian Homes Inc. Concentration account.  If that community is not in the Obligated Group then it sweeps into the Midwest Christian Village Concentration Account. A separate account is maintained for payroll and payroll tax payments.

107.    The entities that have a HUD mortgage are required to maintain their own deposit accounts and operating accounts.  Mortgage payments for the two facilities financed by HUD are made out of each of those respective facilities' accounts.

108.    The Debtors maintain the centralized payable system so almost all payments go out of the Concentration Accounts.  Most vendor disbursements are done via runs of paper checks or wire/ACH payments.

109.    Wire/ACH payments go out of the Midwest Christian Concentration Account - but that activity is very limited.

---

[7] Thirty nine (39) of the accounts are held at Old National Bank, 18 accounts are held at UMB, each of which are restricted cash accounts related to the reserves required under the Debtors' existing bond debt (save and except one reserve account holding the PACE sale proceeds), 4 accounts at Centier Bank, 6 accounts at First Mid Bank, 4 accounts at Heartland Bank, 1 account at PNC Bank, 1 account at Mid-Missouri Bank, 1 account at Jackson County Bank, 4 accounts at Peoples National Bank, 1 account at Hickory Point Bank, 1 account at Marine Bank, 1 account at Southwest Missouri Bank, 1 account at American National bank, 2 accounts at Old National Bank, 2 accounts at Lument Capital, 2 accounts at Kotner Title Company, and 1 account with Corebridge Financial.

110.    The Accounts are listed by Debtor entity in Exhibit A to the Cash Management Motion.  The Unrestricted Cash Accounts and Investments totaled approximately $8,500,000 on May 31, 2024.

111.    The Debtors held approximately $13,000,000 in restricted funds on May 31, 2024, but the vast majority of that was offset by the Indenture Trustee for the Bondholders on or about June 10, 2024.  As of the filing date, the Debtors maintain approximately $1MM in restricted funds after that offset in accounts that are not related to or pledged as security for the Bondholder's debt.

112.    A chart showing the flow of funds through the depository accounts for each facility and into each of the Concentration Accounts is attached to the Cash Management Motion.

**vii.    Utilities Motion**

113.    By the Utilities Motion, the Debtors seek entry of interim and final orders:  (i) prohibiting utility providers from altering, refusing or discontinuing services to or discriminating against, the Debtors because of the commencement of these chapter 11 cases or on account of any outstanding amounts for services rendered prepetition; (ii) determining adequate assurance of payment for future utility services; (iii) establishing procedures for determining adequate assurance of payment for future utility services; and (iv) granting related relief.

114.    In the ordinary course of its business, the Debtors incurs expenses in connection with certain utility providers including gas, electric, and other similar services (the "Utility Services").  The Debtors receive services from approximately 33 utility providers (the "Utility Providers").  On average, the Debtors pay approximately $151,211.69 each month for the Utility Services.

115.    The Utility Services are essential to the Debtor's business; any service interruption would severely disrupt the Debtor's operations and could harm resident care, customer

relationships, revenues, profits, and ultimately its ability to maximize stakeholder recoveries in this chapter 11 case. It is therefore critical that all Utility Services continue to be provided on an uninterrupted basis to the Debtor. Consequently, the Debtors intend to pay all postpetition amounts owed to the Utility Providers.

116.     The Utilities Motion also seeks to preserve the protections that the Utility Providers have under section 366 of the Bankruptcy Code, while affording the Debtors an opportunity to provide and negotiate adequate assurances without facing the threat of immediate termination of its Utility Services. In particular, the Debtors request approval of certain procedures that balance the protections afforded Utility Providers and the Debtors' need for uninterrupted Utility Services, including an adequate assurance deposit equal to approximately two-weeks' worth of Utility Services. The Debtors submit that the foregoing constitutes adequate assurance of future payment to the Utility Providers to satisfy the requirements of Section 366 of the Bankruptcy Code; however, the Utilities Motion provides a mechanism through which Utility Companies may request additional adequate assurance.

**viii.     Motion to Pay Critical Vendors**

117.     In the Critical Vendor Motion, the Debtors request the Court authorize, but not direct, banks and financial institutions to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims. The Debtors purchase goods and services from certain vendors and independent contractors that are unaffiliated with the Debtors and are, by and large, sole source or limited source suppliers or provide a material economic or operational advantage when compared to other available vendors; without them, the Debtors could not operate (collectively, the "Critical Vendors"). The Critical Vendors are

essential to the Debtors' businesses in that the lack of any of their particular services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' ability to maintain safe and hospitable facilities wherein the Debtors' residents can receive the care and attention that they need.

118.     Upon careful consideration and in consultation with their professionals, the Debtors have determined that selling substantially all of their assets in one or more going-concern sales will maximize the value of the Debtors' estates and creditor recoveries.  To that end, the Debtors have reviewed their accounts payable to identify those vendors truly essential to the Debtors' operations and, in turn, to the consummation of one or more value-maximizing asset sales.

119.     The Debtors' Critical Vendors generally fall into one or more of the following categories:

a.     Operational Vendors – Several of the Debtors' Critical Vendors are providers of the various supplies that are essential to the daily operation of the Debtors' healthcare facilities.  The operational vendors include, but are not limited to, food distributors, information technology and systems providers, mechanical supply providers, hospitality vendors, and various operational equipment (including maintenance of such equipment) and service providers.  These operational vendors are critical for the Debtors to maintain their ability continue to adequately care for their residents without interruption.

b.     Healthcare Vendors – Several of the Debtors' Critical Vendors are providers of the essential healthcare supplies that are required for the daily care of the residents in the Debtors' facilities.  The healthcare vendors include, but are not limited to, pharmacy vendors and medical device and equipment providers.  The healthcare vendors are essential to the Debtors' operations and ability to provide uninterrupted and adequate care for their residents.

120.     In total, the Debtors believe the Critical Vendors are owed $2,796,271.  The Debtors propose to maintain a matrix summarizing (i) the name of each Critical Vendor paid, and (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim (and any 503(b)(9) Claims).  This matrix will be provided, upon request, to the Office of the United States

Trustee, the professionals retained by any official committee appointed in the Chapter 11 Cases, and counsel to the lenders under the Debtors' proposed DIP facility; provided, that the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including any member of such statutory committee, without the prior written consent of the Debtors.

121.    Replacement vendors, even where available, would likely result in substantially higher costs for the Debtors.  Some of the Debtors' facilities are located in remote locations where, in certain instances, there is only one particular Critical Vendor that can provide the goods and/or services required by the Debtors to maintain safe and hospitable facilities.  Even if it were possible to locate alternate Critical Vendor services, the costs associated with switching from one vendor to another are significant and would be detrimental to the Debtors' estates.  The delay caused by switching would make it impossible for the Debtors to continue operations and therefore would hurt the Debtors' ability to preserve asset value.  Moreover, any interruption of the Critical Vendor Services would prevent the Debtors from, among other things: (i) providing critical rehabilitation and therapy services; (ii) providing necessary meal services to residents and (iii) generally maintaining safe and hospitable facilities, all of which are necessary to the success of the Debtors.

122.    The Debtors believe that the Critical Vendors may immediately stop existing shipments and services, refuse to provide future shipments and services, and/or would immediately tighten credit terms if the Debtors do not have authority to satisfy the Critical Vendors' prepetition claims.  Given that the success of the Debtors' business and the care of the Debtors' residents depends on, among other things, their ability to (i) provide operational and healthcare supplies and services, and (ii) continue to employ skilled nurses, these disruptions would have an immediate and detrimental impact on operations and resident care.  The Debtors' goals in these chapter 11

cases are to facilitate an orderly administration of their bankruptcy cases and to maintain efficient and seamless operations for the benefit of the residents in the nursing homes operated by the Debtors in order to maximize the value of their assets for the benefit of all stakeholders.

123.    To effectuate the substantive relief requested above, the Debtors seeks entry of interim and final orders authorizing all applicable banks and financial institutions to receive, process, honor and pay all checks presented for payment and all electronic payment requests made by the Debtors related to payments to the Critical Vendors, whether such payments were presented or electronic requests were submitted before or after the date hereof.

124.    Additionally, the Debtors receive certain supplies on an order-by-order basis.  As of the Petition Date, the Debtors believe that they owe certain Critical Vendors on account of goods received by the Debtors within the 20 days immediately prior to the Petition Date (claims related to such goods, the "503(b)(9) Claims").  After closely analyzing the scope of potential 503(b)(9) Claims, the Debtors expect that the majority of the 503(b)(9) Claims will come due prior to a final hearing on this Motion.  The Debtors seek to have Critical Vendors which hold 503(b)(9) Claims apply any postpetition payment received under proposed orders in the first instance against such Critical Vendors' 503(b)(9) Claims(s), in full or in part, as applicable.

ix.    **Motion to Dispense with Patient Care Ombudsman**

125.    The Debtors use a combination of their own employees and staffing agencies to provide various services to Residents.

126.    The Debtors are subject to frequent and thorough external state and federal regulatory oversight and also adhere to internal quality control policies and procedures to maintain the quality of Resident care for the overall communities.  As of the Petition Date, the Debtors are in full compliance with their regulatory obligations at nine (9) of their eleven (11) communities.

38

The two (2) communities Spring River Christian Village and River Birch Living not in substantial compliance have submitted acceptable plans of correction to the regulatory bodies and are awaiting notice of compliance.  However, none of these deficiencies at these two (2) communities relate to a substandard level of care or pose an immediate jeopardy to patient safety.  Instead, Spring River Christian Village was cited in May of 2024 for not having a record of fire alarm testing and use of an unauthorized waste basket.  Both deficiencies have been corrected and the regulatory body has accepted the plan of correction.  River Birch Living was inspected by the Fire Marshal in January of 2024 and a some concerns, all related to fire code compliance, were noted  While the Debtors took each of these deficiencies seriously and either have remediated, or are in the process of doing so, each of the deficiencies, none of the deficiencies related to patient care.

127.    Each of the communities are governed and monitored on an annual basis by state agencies overseeing the Debtors in each of Illinois, Missouri, Indiana and Iowa, in addition to onsite visits for any complaint or self-reported incident that the state determines to investigate. The Centers for Medicaid and Medicare Services also provides oversight and reserves the right to conduct independent onsite investigations and surveys.   Moreover, each community has Ombudsmen that also conducts routine visits and investigations to monitor patient care and safety. Each state's State Long-Term Care Ombudsman and regional Ombudsman that advocates for residing in long-term care facilities, including nursing homes, assisted care living facilities, homes for the aged and adult care homes. Ombudsmen are available to help residents and their families resolve problems and answer questions related to long-term care.  When residents and families cannot resolve their problems through consultation with the facility staff or governmental agencies involved, they may contact their Ombudsmen.  Ombudsmen concerns can include quality of care, financial information, resident rights, admissions, transfer, and discharge.   How to contact

Ombudsmen is posted prominently in each of the Debtors' facilities.  Moreover, each Resident, upon moving into the Debtors' facilities, are also provided contact information on how to contact state regulatory agencies and Ombudsman in their Residents' handbook.

128.   The Debtors also have extensive internal policies and procedures to monitor the quality of Resident care for the overall community.  Communities utilize policies and procedures following CMS pathways to ensure compliance with regulations.  There is also a Quality Assurance and Process Improvement program in place to continuously review quality of care and ensure practices are in place to ensure compliance.  The Quality Assurance and Process Improvement Program each conduct internal audits on each facility and incorporate any findings form any outside agencies or Ombudsman, and report those to the Quality Assurance and Process Improvement Committee established by the Debtors and then institute a regime to correct any areas of concern.

129.   The Debtor has a company-wide policy that was updated and effective August 7, 2023. It is the policy of Christian Horizons to provide residents, their representative or family members with a grievance process to communicate in writing any concerns, suggestions, complaints or opportunities for improvement in care and services and receive a written response to the submitted grievance.  Any resident or their representative or family member may submit a grievance concerning his or her treatment, medical care, safety or other issues without fear of reprisal of any type. Grievance forms are located throughout the community and forms are logged and community has five (5) days to respond.  The procedure is as follows once a grievance is received:

    a.    The Responsible Person reviews open grievances in the Daily QA meeting with the appropriate department leader and or the Executive Director/Administrator.

    b.    The appropriate department leader investigates grievances, documents findings,

and reports the outcome of the investigation to Responsible Person.

c.      The Responsible Person reviews the completed grievance with the Executive Director/Administrator.  Review includes ensuring a response has been given to the person initiating the grievance and that the response, and corrective action plan, if applicable, is documented.

d.      The Executive Director/Administrator ensures grievances are addressed and resolved within a 5-day time frame and final outcome, including any corrective action plan, is communicated to the person originating the grievance.  The Executive Director/Administrator will sign all completed grievances, indicating review and completion.

e.      Copies of all grievances are maintained per the Record Retention policy.

Appointing an additional new ombudsman would be a material additional expense for the estates.

**Finance and Sale Related Motions**

**x.**      **Joint Motion for Usage of Cash Collateral and DIP Financing**

130.    Pursuant to the DIP Financing Motion, the Debtors request the court enter an order (1) authorizing the Debtors to enter into a senior secured, superpriority debtor in possession financing facility with UMB in an (a) interim amount not to exceed three million dollars ($3,000,000) and only as needed to avoid immediate and irreparable harm, and (b) after a final hearing, an amount to be determined upon finalized of an extended budget (as amended, modified or otherwise in effect from time to time, the "DIP Facility"), substantially on the terms set forth in Declaration,  and (c) granting the DIP Liens and the DIP Superpriority Claims; (2) authorizing the Debtors to use cash collateral; (3) authorizing the Debtors to grant adequate protection to UMB, in its capacities as pre-petition Trustee; (4) granting liens, security interests and superpriority claims in favor of the DIP Lender; (5) modifying the automatic stay as imposed by § 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Facility and the DIP Orders; and (6) scheduling an interim hearing to approve the proposed Interim Order and a final hearing with respect to Final Order.

131.    As the Debtors have entered into bankruptcy proceedings, the Debtors need the ability to obtain postpetition financing in the form of the DIP Facility.  The Debtors require access to Cash Collateral of the Trustee and the cash collateral, if any, of HUD, and the DIP Facility to satisfy ongoing cash requirements, pay employees, pay utilities, to fund ordinary course day-to-day expenditures, and to conduct an orderly sale while maintaining operations through the sale of assets.  Without immediate access to cash collateral and DIP Facility proceeds, the going-concern value of the Debtors' non-cash assets will be impaired, and Debtors will be unable to satisfy its present obligations, resulting in immediate and irreparable harm to the Debtors' estates.  The importance of the Debtors' immediate need for use of cash collateral and DIP Facility proceeds cannot be overstated, and is critical to the Debtors' efforts to maximize returns to creditors in these cases.

132.    A critical need exists for the Debtors to obtain funds to cover the operational, capital and administrative needs of the Facilities, solely to the extent set forth under the DIP Budget and under the DIP Facility (as each is defined below).  The Debtors are unable to obtain postpetition financing on an unsecured basis under §§ 364(c)(1) or 503(b)(1) of the Bankruptcy Code.  Further, the Debtors assert that they are also unable to obtain secured credit from sources other than the DIP Lender that would be allowable under §§ 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code for the purposes set forth in the Interim Order.  Further, the Trustee would not consent to any priming liens and would have argued that the Debtors could not have provided adequate protection for any such proposed financing.

133.    In addition to the use of the Trustee's Cash Collateral, the DIP Lender has agreed to provide the requested Initial DIP Loans (as defined below) under the DIP Facility and use of Cash Collateral in accordance with the terms contained in the Interim Order, in the amounts,

categories and times set forth in the DIP Budget (as defined below), which Initial DIP Loan shall be used for the necessary operational costs associated with the Facilities and other costs and expenses of administration of the chapter 11 cases for the period commencing with entry of the Interim Order and continuing until entry of the Final Order, whereupon the DIP Budget will be extended, subject to the approval of the DIP Lender and the Trustee, in their sole discretion.

134.    Without the Initial DIP Loans, the Debtors will be unable to pay necessary payroll, costs, and operating expenses and obtain goods and services in a manner that will avoid irreparable harm to the Debtors' estates and to the Residents.  At this time, the Debtors' ability to finance the ongoing operation and availability of sufficient liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations as provided herein are vital to the preservation and maintenance of the going concern of the Debtors' estates and to otherwise provide the necessary services to the Residents.

135.    The Debtors have requested that the DIP Lender provide the Initial DIP Loans up to an aggregate amount of $3.0 million, which funds shall be used by the Debtors solely to the extent provided in the DIP Budget attached as Exhibit B.  At the expiration of the Interim Order, the DIP Lender, subject to entry of the Final Order in a form acceptable to the DIP Lender, shall continue to advance funds through additional DIP loans (together with the Initial DIP Loans, the "DIP Loans"), up to an aggregate amount of to be determined upon finalization of an extended DIP Budget.

136.    The DIP Lender's lending of the Initial DIP Loans is conditioned upon the grant of a lien that: (i) will prime and remain senior to the Trustee's Pre-Petition Liens; and (ii) will otherwise constitute a first priority lien in all Post-Petition Collateral (as defined in the Interim Order), subject only to the Carve-Out (as defined below).  Post-Petition Collateral shall exclude

(i) resident deposits held in one or more segregated accounts in the aggregate amount of $10,000, (ii) the HUD-Financed Properties, (iii) the IHDA-Financed Property and (iv) actions for preferences, fraudulent conveyances or other avoidance power claims and any recoveries under sections 542, 544, 545, 547, 548 (exclusive of transferees under section 549), 550 and 553 and the Bankruptcy Code (collectively, the "Avoidance Actions") and the proceeds thereof; provided that the DIP Credit Agreement contemplates that the Post-Petition Collateral includes the HUD-Financed Properties, the IHDA-Financed Property, Avoidance Actions and proceeds thereof, and the upon entry of the Final Order; and, provided further that the DIP Lender reserves the right to request that the Post-Petition Collateral include the HUD- Financed Properties, Avoidance Actions and proceeds thereof in any Final Order on the Motion.

137.    The DIP Loans will benefit all of the estates and will cover common corporate overhead costs.  The DIP Loans will also allow further marketing of the facilities under the bid and sale procedures described below.  Bids for all or large groups of the facilities are much more likely to maximize values and will be easier to close than sales of each facility individually and the seven LOIs received to date have been for groups of the facilities.

138.    The terms of the Initial DIP Loans have been negotiated in good faith and at arm's length among the Debtors and the DIP Lender.  The terms of the Initial DIP Loans are at least as favorable to the Debtors as those available from alternative sources, under all of the circumstances.  Given the current market conditions and under the particular circumstances of these chapter 11 cases, no other sources of funding are available on better overall terms.  Given the exigencies of the case, the Debtors believe the Initial DIP Loans are the best and only option.

**xi.**      **Motion to Approve Bidding Procedures and Sales Process (Hearing Date to be Set)**

139.      The Debtors are requesting that this Motion be set for hearing the week of July 22, 2024 or early the week of July 29, 2024 (before July 31, 2024).

140.      The factual predicates for the Motion to Approve Bidding Procedures and Sales Process is set forth *supra* paragraphs 27-30.

**xii.**     **Retention of Professionals**

141.      The Debtors will separately be seeking authority to retain and employ various professionals in these chapter 11 cases.  The Debtors will be seeking the retention of (i) Dentons US LLP as counsel, (ii) Summers Compton Wells, LLC as local counsel, (iii) Healthcare Management Partners, LLC as Chief Restructuring Officer and Restructuring Officers, Shawn O'Connor as Chief Restructuring Officer, Scott Phillips and Zach Rowe as Restructuring Officers, (iv) B.C. Ziegler and Company as investment banker, and (v) Kurtzman Carson Consultants, LLC d/b/a Verita Global as claims and noticing and administrative agent.

FURTHER DECLARANT SAYETH NOT.


Date:  July 16, 2024

Kathleen (Kate) Bertram
President and Chief Executive Officer
**MIDWEST CHRISTIAN VILLAGES, INC. and related Debtors**