EFILED
4/13/2022 3:16 PM
Paul Palazzolo
7th Judicial Circuit
Sangamon County, IL

# IN THE CIRCUIT COURT
## FOR THE SEVENTH JUDICIAL CIRCUIT
### SPRINGFIELD, SANGAMON COUNTY, ILLINOIS

| | |
|---|---|
| **VICTORIA L. HUFFSTUTLER as Executor of The Estate of Fred A. Huffstutler, deceased** ) | **CASE No.** 2022LA000061 |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **LEWIS MEMORIAL CHRISTIAN VILLAGE, an Illinois Corporation, s/a/k/a CHRISTIAN HORIZONS,** ) | |
| ) | |
| **Defendant.** ) | **JURY DEMAND** |

## COMPLAINT

**NOW COMES** the Plaintiff, Victoria L. Huffstutler, as Executor of the Estate of Fred A. Huffstutler, deceased, by and through her attorneys, WOLTER, BEEMAN, LYNCH & LONDRIGAN, LLP, and complaining of Defendant, Lewis Memorial Christian Village, an Illinois corporation, s/a/k/a Christian Horizons, affirmatively states as follows:

## COUNT I

**Victoria L. Huffstutler as Executor v. Lewis Memorial Christian Village
Nursing Home Negligence – wrongful death** 740 ILCS 180/1
**(Nursing Home Care Act, 210 ILCS 45/1-101 et seq.)
210 ILCS 45/2-107
210 ILCS 45/3-601**

For her first cause of action against Lewis Memorial Christian Village, an Illinois Corporation, plaintiff Victoria L. Huffstutler, as Executor, states as follows:

1.      Victoria L. Huffstutler is the duly appointed Executor of the Estate of Fred A. Huffstutler, deceased, having been duly appointed in such capacity on 04/07/22 in connection with Sangamon County Circuit Court Case # 2022-PR-143.

2.      Fred A. Huffstutler, deceased, was born on 04/06/40 and at the time of his death on 04/27/20 was 80 years of age.

3.       Defendant, Lewis Memorial Christian Village is a long-term care facility which is licensed pursuant to the Illinois "Nursing Home Care Act," 210 ILCS 45/1-101, et seq (WEST 2018).

4.      On or about 04/16/20 Fred A. Huffstutler was discharged from St. John's Hospital in Springfield, Illinois after having received a discharge physical exam by Saliha Saleem, M.D.

5.      The discharge from St. John's Hospital on 04/16/20 specified that Fred A. Huffstutler required inpatient post-hospital skilled care.

6.      Fred A. Huffstutler was thereafter discharged on 04/16/20 from St. John's Hospital and transported to Lewis Memorial Christian Village located at 3400 West Washington Street, Springfield, Illinois.

7.      Upon admittance to Lewis Memorial Christian Village on 04/16/20 no one signed either a Lewis Memorial Christian Village "Admission Agreement" or a "Health Care Arbitration Agreement," as set forth in 710 ILCS 15/9 (2018 State Bar Edition).

8.     On 04/17/20 after admission to Lewis Memorial Christian Village, Julia Ryan, an LPN at Lewis Memorial Christian Village performed a functional abilities assessment for Fred A. Huffstutler which specifically noted that Fred A. Huffstutler required substantial/maximal assistance to bring food and/or liquid to his mouth and to swallow food or liquid.

9.     On 04/19/20 Latrice Hall, an LPN at Lewis Memorial Christian Village also performed a functional abilities assessment for Fred A. Huffstutler which again specifically noted that Fred A. Huffstutler required substantial/maximal assistance to bring food and/or liquid to his mouth and to swallow food or liquid.

10.     While at Lewis Memorial Christian Village the staff failed to monitor and/or document the liquid intake and output of Fred A. Huffstutler.

11.     While at Lewis Memorial Christian Village the staff failed to monitor and/or document the skin turgor of Fred A. Huffstutler.

12.     While at Lewis Memorial Christian Village the staff failed to monitor and/or document the percentage of meal intake of Fred A. Huffstutler.

13.     While at Lewis Memorial Christian Village the staff failed to monitor and/or document the lab work of Fred A. Huffstutler.

14.     While at Lewis Memorial Christian Village the staff failed to monitor and/or document the mental status of Fred A. Huffstutler.

15.     While at Lewis Memorial Christian Village the staff failed to communicate to the nurse practitioner or physician the need for nutritional services to assess the dietary status and fluid requirements necessary for a patient on an altered diet with altered consistency.

16.     While at Lewis Memorial Christian Village there was a failure to assess the urine output of Fred A. Huffstutler.

17.     While at Lewis Memorial Christian Village there was a failure to assess the kidney functions of Fred A. Huffstutler.

18.     The staff at Lewis Memorial Christian Village failed to promptly recognize Fred A. Huffstutler's decline in clinical status and/or communicate this decline to the nurse practitioner or physician.

19.     On 04/20/20 at 5:31 pm Victoria L. Huffstutler sent an e-mail to jalexander@chliving.org complaining about various care related issues at Lewis Memorial Christian Village and asking why no admission forms had yet been signed.

20.     On 04/21/20 Victoria L. Huffstutler after having been called and asked to proceed to Lewis Memorial Christian Village, did proceed to this nursing home. .

21.     After arriving at Lewis Memorial Christian Village Victoria L. Huffstutler was asked to sign a "Health Care Arbitration Agreement," which she refused to sign.

22.     Victoria L. Huffstutler was also presented with a Lewis Memorial Christian Village "Admission Agreement," which had been back-dated to April 16, 2020.

23.     No one signed as the "Legal Representative" for Fred A. Huffstutler on the "Admission Agreement."

24.     A purported signature of "Vicky Huffstutler" appears on the "Admission Agreement, not as the "legal Representative," but as the "Responsible Party" to pay the nursing home bills and expenses of Fred A. Huffstutler.

25.     Victoria L. Huffstutler does not recall signing the "Admission Agreement" for the 04/16/20 admission of Fred A. Huffstutler at any time.

26.     Victoria L. Huffstutler does not recognize the signature which purports to be the signature of Victoria L. Huffstutler as a "Responsible Party" on the "Admission Agreement" as her actual signature, and believes it is not her signature.

27.     On 04/21/20 Fred A. Huffstutler was emergently transferred from Lewis Memorial Christian Village to St. John's Hospital.

28.     Upon emergent admission to St. John's Hospital on 04/21/20 Fred A. Huffstutler was found to be suffering from profound dehydration, acute renal failure, a fever of 100.9, and a white blood cell count of 16.51.

.29.     Upon emergent admission to St. John's Hospital on 04/21/20 Fred A. Huffstutler was found to have a sodium level of 157, an acute kidney injury (AKI) with creatine of 4.3, chloride of 127, BUN of 95 and blood glucose of 253.

30.     On 04/16/20 and thereafter continuing through 04/21/20, defendant, Lewis Memorial Christian Village had a duty not to neglect any resident and not to engage in any negligent act or omission while caring for a resident.

31.     During the time period from 04/16/20 through 04/21/20, defendant Lewis Memorial Christian Village, through its employees and staff, and in violation of its duty to Fred A. Huffstutler, committed one or more of the following negligent acts and/or omissions:

    (a)     Failed to monitor and/or document the liquid intake of Fred A. Huffstutler; and/or

    (b)     Failed to monitor and/or document the skin turgor of Fred A. Huffstutler; and/or

    (c)     Failed to monitor and/or document the lab work of Fred A. Huffstutler; and/or

    (d)     Allowed Fred A. Huffstutler to become profoundly dehydrated; and/or

(e)     Failed to monitor and/or document the percentage of meal intake of Fred A. Huffstutler; and/or

(f)     Failed to monitor and/or document the urine output of Fred A. Huffstutler; and/or

(g)     Failed to monitor and/or document the mental status of Fred A. Huffstutler; and/or

(h)     Failed to access the kidney functions of Fred A. Huffstutler; and/or

(i)     Failed to follow its own plan requiring substantial/maximal assistance to Fred A. Huffstutler in bringing liquid to his mouth and in swallowing it; and/or

(j)     Failed to communicate to the nurse practitioner or physician thee need for nutritional services to assess the dietary status and fluid requirements necessary for a patient on an altered diet with altered consistency; and/or

32.    As a direct and proximate result of one or more of the foregoing acts and/or omissions, Fred A. Huffstutler became profoundly dehydrated and suffered acute kidney failure which would have required dialysis had he survived in addition to exacerbating his other medical conditions, eventually resulting in his failure to thrive and survive, all to the damage of Fred A. Huffstutler in a sum of money in excess of $50,000.00.

**WHEREFORE,** Victoria L. Huffstutler, as Executor of the Estate of Fred A. Huffstutler, deceased, demands judgment against Defendant, Lewis Memorial Christian Village in such sum of money in excess of $50,000.00 as may be proven by the evidence, together with costs of this suit, and prays that the issues involved herein be tried by jury.

EXHIBIT A

## COUNT II

**Victoria L. Huffstutler, as Executor v. Lewis Memorial Christian Village**
**(Nursing Home Negligence – Survival Action)**
**(Nursing Home Care Act, 210 ILCS 45/1-101 et seq.)**
**210 ILCS 45/2-107**
**210 ILCS 45/3-601**

For her second cause of action against Lewis Memorial Christian Village, plaintiff Victoria L. Huffstutler, as Executor, states as follows:

33.    Plaintiff realleges and incorporates by reference, each and every allegation contained in paragraphs 1-32 of the first cause of action, designated as Count I above, as though set forth in full in Count II herein.

34.    As a proximate result of one or more of the foregoing acts and/or omissions, Fred A. Huffstutler experienced great pain and suffering up to and including the date of his death on 04/27/20.

**WHEREFORE,** Victoria L. Huffstutler, as Executor of the Estate of Fred A. Huffstutler, deceased, demands judgment against Defendant, Lewis Memorial Christian Village in such sum of money in excess of $50,000.00 as may be proven by the evidence, together with costs of this suit, and prays that the issues involved herein be tried by jury.

## COUNT III

**Victoria L. Huffstutler as Executor v. Lewis Memorial Christian Village
Common Law Institutional Negligence – wrongful death**

For her third cause of action against Lewis Memorial Christian Village, an Illinois Corporation, plaintiff Victoria L. Huffstutler, as Executor, states as follows:

35.    Plaintiff realleges and incorporates by reference, each and every allegation contained in paragraphs 1-32 of the first cause of action, designated as Count I above, as though set forth in full in Count III herein.

**WHEREFORE,** Victoria L. Huffstutler, as Executor of the Estate of Fred A. Huffstutler, deceased, demands judgment against Defendant, Lewis Memorial Christian Village in such sum of money in excess of $50,000.00 as may be proven by the evidence, together with costs of this suit, and prays that the issues involved herein be tried by jury.

## COUNT IV

**Victoria L. Huffstutler as Executor v. Lewis Memorial Christian Village
Common Law Institutional Negligence – survival action**

For her fourth cause of action against Lewis Memorial Christian Village, an Illinois Corporation, plaintiff Victoria L. Huffstutler, as Executor, states as follows:

36.    Plaintiff realleges and incorporates by reference, each and every allegation contained in paragraphs 1-32 of the first cause of action, designated as Count I above, as though set forth in full in Count IV herein.

37.    As a proximate result of one or more of the foregoing acts and/or omissions, Fred A. Huffstutler experienced great pain and suffering up to and including the date of his death on 04/27/20.

**WHEREFORE,** Victoria L. Huffstutler, as Executor of the Estate of Fred A. Huffstutler, deceased, demands judgment against Defendant, Lewis Memorial Christian Village in such sum of money in excess of $50,000.00 as may be proven by the evidence, together with costs of this suit, and prays that the issues involved herein be tried by jury.

<u>**COUNT V**</u>

**Victoria L. Huffstutler as Executor v. Lewis Memorial Christian Village
Loss of Consortium**

For her fifth cause of action against Lewis Memorial Christian Village, an Illinois Corporation, plaintiff Victoria L. Huffstutler, as Executor, states as follows:

38..    Plaintiff realleges and incorporates by reference, each and every allegation contained in paragraphs 1-32 of the first cause of action, designated as Count I above, as though set forth in full in Count V herein.

39.    By reason of his injury and ultimate death the adult children of Fred A. Huffstutler have been deprived of the love and affection they previously enjoyed with Fred A. Huffstutler.

**WHEREFORE,** Victoria L. Huffstutler, as Executor of the Estate of Fred A. Huffstutler, deceased, demands judgment against Defendant, Lewis Memorial Christian Village in such sum of money in excess of $50,000.00 as may be proven by the evidence, together with costs of this suit, and prays that the issues involved herein be tried by jury.

Respectfully submitted,

**VICTORIA L. HUFFSTUTLER, as Executor of the Estate of Fred A. Huffstutler, deceased, Plaintiff,**

By_____

Bruce A. Beeman, one of her Attorneys

EXHIBIT A

STATE OF ILLINOIS        )
                               ) ss.

COUNTY OF SANGAMON    )

## A F F I D A V I T

I, Victoria L. Huffstutler, being first duly sworn upon oath, do hereby state, pursuant to Supreme Court Rule 222(b), as follows:

1.     I am a Plaintiff in the claim to which this Affidavit is attached.

2.     The total of money damages sought in this action does in fact exceed the sum of $50,000.00.

**FURTHER AFFIANT SAYETH NOT.**

_Victoria L. Huffstutler_
Victoria L. Huffstutler

SUBSCRIBED AND SWORN to before me this _13th_ day of April, 2022.

_Lynnett M. Baker_
Notary Public

Prepared by:
Bruce A. Beeman
WOLTER, BEEMAN, LYNCH & LONDRIGAN, LLP
1001 South Sixth Street
Springfield, Illinois  62703
Telephone:  217.753.4220
Attorney No. 0155314
bbeeman@WBLlawyers.com
lsuter@WBLlawyers.com

Official Seal
Lynnett M Baker
Notary Public State of Illinois
My Commission Expires 10/10/2025

beeman\huffstutler\Complaint 1

STATE OF ILLINOIS        )
                                  ) ss.
COUNTY OF SANGAMON    )


## AFFIDAVIT


      I, Bruce A. Beeman, being first duly sworn, do hereby state, pursuant to 735 ILCS 5/2-622(a)(1), as follows:

      1.      Affiant has consulted and reviewed the facts of this case with a health care professional, namely a board certified family practice physician licensed in the State of Illinois, who the Affiant reasonably believes: (i) is knowledgeable in the relevant issues involved in this particular action; (ii) practices or has practiced within the last five years in the same area of healthcare or medicine that is in issue in this particular action; (iii) meets the expert witness standards set forth in paragraphs (a) through (d) of Section 8-2501; and, in addition thereto, is also qualified by experience or has demonstrated competence in the subject of the case.

      2.      The reviewing health care professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for filing this action.  A copy of said written report and CV of the physician is attached hereto and incorporated herein by reference.

EXHIBIT A

3.    Affiant has concluded on the basis of the reviewing health care professional's review and consultation that there is a reasonable and meritorious cause for the filing of this action.

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

_____
Bruce A. Beeman

## CERTIFICATE OF MERIT

### I.
### Background

1.      My name is Mark B. DeYoung. I am a medical doctor.

2.      I am a graduate of the University of Michigan medical school, having received a Doctor of Medicine degree in 1978.

3.      I am Board Certified in Family Practice and am licensed to practice medicine in all of its branches in both Illinois (license # 036-108454) and Michigan (license # 4301041207).

4.      I am a member of the American Medical Association, the American Academy of Family Physicians, and the Illinois Academy of Family Physicians.

5.      My professional address is 904 East Main Street, Knoxville, Illinois 61448.

6.      Family practice doctors generally provide care to people of all ages. Family practice doctors treat chronic conditions, evaluate symptoms, and offer preventative care. Family practice doctors are often the first to detect emerging conditions. Family practice doctors order, perform, and interpret tests to diagnose conditions, explain results, monitor progress and reevaluate treatment, when necessary. Family practice doctors often have experience with patients who are later admitted to long term skilled care facilities.

7.      I am familiar with the standard of care of a long-term skilled care facility in the State of Illinois as it relates to keeping a resident like Fred A. Huffstutler, who the care facility itself determined required substantial/maximal assistance to bring liquid to his mouth and swallow it, to remain properly hydrated. The standard of care in this respect is uniform throughout the State of Illinois.

### II.
### Materials Reviewed

8.      I have reviewed medical records relating to Fred A. Huffstutler in connection with his 04/10/20 admission and 04/16/20 discharge from St. John's Hospital, in Springfield, Illinois.

9.      I have reviewed medical care records relating to Fred A. Huffstutler in connection with his care while at Lewis Memorial Christian Village in Springfield, Illinois from 04/16/20 through 04/21/20.

10.    I have reviewed medical records relating to Fred A. Huffstutler in connection with his emergent re-admission to St. John's Hospital on 04/21/20.

III.
Plan of Care while at Lewis Memorial Christian Village

11.    On 04/17/20 after admission to Lewis Memorial Christian Village, Julia Ryan, an LPN at Lewis Memorial Christian Village performed a functional abilities assessment for Fred A. Huffstutler which specifically noted that Fred A. Huffstutler required substantial /maximal assistance to bring food and/or liquid to his mouth and to swallow food or liquid.

12.    On 04/18/20 Latrice Hall, an LPN at Lewis Memorial Christian Village also performed a functional abilities assessment for Fred A. Huffstutler which again specifically noted that Fred A. Huffstutler required substantial /maximal assistance to bring food and/or liquid to his mouth and to swallow food or liquid.

IV.
Condition of Fred A. Huffstutler
Upon His Emergent Re-admission to St. John's Hospital on 04/21/20

13.    Fred A. Huffstutler was emergently transferred back to St. John's Hospital from Lewis Memorial Christian Village on 04/21/20. Upon admission to St. John's Hospital Fred A. Huffstutler was found to be profoundly dehydrated, suffering from an acute kidney injury, with sodium of 157, creatine of 4.3, chloride of 127, BUN of 95, and blood glucose of 253.

14.    After a review of the foregoing records relating to Fred A. Huffstutler, as well as my education, training and experience, I do believe and state, based upon a reasonable degree of medical certainty, that Lewis Memorial Christian Village fell below the applicable standard of care in connection with Fred A. Huffstutler in one or more of the following respects:

(a)    Failed to monitor and/or document the liquid intake of Fred A. Huffstutler; and/or

(b)    Failed to monitor and/or document the skin turgor of Fred A. Huffstutler; and/or

(c)    Failed to monitor and/or document the lab work of Fred A. Huffstutler; and/or

(d)    Allowed Fred A. Huffstutler to become profoundly dehydrated; and/or

(e)    Failed to monitor and/or document the percentage of meal intake of Fred A. Huffstutler; and/or

(f)    Failed to monitor and/or document the urine output of Fred A. Huffstutler; and/or

(g)    Failed to monitor and/or document the mental status of Fred A. Huffstutler; and/or

(h)    Failed to access the kidney functions of Fred A. Huffstutler; and/or

(i)    Failed to follow its own plan requiring substantial/maximal assistance to Fred A. Huffstutler in bringing liquid to his mouth and in swallowing it; and/or

(j)    Failed to communicate to the nurse practitioner or physician the need for nutritional services to assess the dietary status and fluid requirements necessary for a patient on an altered diet with altered consistency; and/or

15.    As a proximate result of one or more of the foregoing acts and/or omissions of Lewis Memorial Christian Village, Fred A. Huffstutler became profoundly dehydrated and suffered acute kidney failure, which, in addition to exacerbating his other medical conditions, eventually resulted in his failure to thrive and survive.

16.    Because of the foregoing, I believe that there is a reasonable and meritorious basis for bringing a negligence cause or causes of action in this case against Lewis Memorial Christian Village.


_____        4-12-22
Mark B. DeYoung, MD                     Date of Certificate

MARK B. DEYOUNG,M.D.
Michigan License #4301041207
Illinois License #036-108454

| | | |
|---|---|---|
| **MEDICAL SCHOOL:** | University of Michigan<br>AnnArbor,MI<br>Doctor of Medicine | 7/1974-7/1978 |
| **COLLEGE ATTENDED:** | Michigan State University<br>East Lansing,MI<br>BS Degree in Physiology | 7/1970-7/1974 |
| **RESIDENCY:** | Family Practice<br>Bronson and Borgess Hospitals<br>Kalamazoo,MI | 7/1978-7/1981 |
| | Chief Resident | 7/1979-7/1981 |
| **CERTIFICATION:** | Board Certified in Family Practice<br>Recertified multiple times | 7/1981-8/2025 |
| **PROFESSIONAL<br>WORK EXPERIENCE:** | Graham Health System<br>210 W. Walnut St.<br>Canton, IL. 61520 | 2022- |
| | Knoxville Clinic<br>904 East Main<br>Knoxville, IL 61448<br>Affiliate of Galesburg Cottage Hospital | 3/2003-2/2022 |
| | Family Practice Physician<br>Westside Family Medical Center,P.C.<br>6565 West Main<br>Kalamazoo,MI 49009 | 5/1986-10/2002 |
| | Private Practice<br>Watervliet,MI | 8/1981-4/1986 |

| | | |
|---|---|---|
| **CLINICAL RESEARCH:** | Sub-Investigator in Clinical Research<br>Westside Family Medical Center,P.C. | 5/1986-10/2022 |
| | | |
| **HOSPITAL AFFILIATIONS:** | Graham Health System<br>210 W. Walnut St.<br>Canton, IL. 61520 | 2022- |
| | Galesburg Cottage Hospital<br>695 N. Kellogg St.<br>Galesburg, IL  61401 | 3/2003-2/2022 |
| | OSF St. Mary Medical Center<br>3333 N. Seminary St.<br>Galesburg,IL  61401 | 3/2003-5/2009 |
| | Bronson Methodist Hospital<br>Kalamazoo,MI | 5/1986-10/2002 |
| | Borgess Hospital<br>Kalamazoo,MI | 5/1986-10/2002 |
| | Community Hospital of Watervliet<br>Watervliet,MI | 7/1981-4/1986 |
| | Pipp Community Hospital<br>Plainwell, MI (ER department) | 8/1979-4/1981 |
| | Franklin Community Hospital<br>Vicksburg,MI (ER department) | 8/1979-4/1981 |
| | Zealand Community Hospital<br>Zealand,MI (ER department) | 8/1979-4/1981 |
| | | |
| **ORGANIZATIONS:** | American Academy of Family Physicians | 7/1978-8/2025 |
| | American Medical Association | 7/1980-8/2010 |
| | Michigan Academy of Family Physicians | 7/1978-6/2002 |
| | American College of Emergency Physicians | 7/1980-6/1984 |
| | Illinois Academy of Family Physicians | 7/2002-8/2025 |
| | American Society for Colposcpy and<br>    Cervical Pathology | 8/199-6-2007 |

EXHIBIT A

| | | |
|---|---|---|
| **ACTIVITIES:** | Chairperson  Department of Primary Care<br>Galesburg Cottage Hospital | 7/2017-2/2022 |
| | Chairperson Bylaws Committee<br>Galesburg Cottage Hospital | 7/2017-2/2022 |
| | Member Executive Committee<br>Galesgurg Cottage Hospital | 7/2017-2/2022 |
| | Quorum Physician Advisory Committee | 7/2016-7/2020 |
| | President Medical Staff<br>Galesburg Cottage Hospital | 7/2010-7/2011 |
| | Vice President Medical Staff<br>Galesburg Cottage Hospital | 7/2008-7/2010 |
| | Chairman Quality Improvement Committee<br>Galesburg Cottage Hospital | 7/2008-7/2010 |
| **ACTIVITIES:**<br>(continued) | Chairman Utilization Review Committee<br>Galesburg Cottage Hospital | 7/2007-2/2022 |
| | Chairman Family Practice Department<br>Galesburg Cottage Hospital | 7/2008-7/2011 |
| | Member Infection Control<br>Galesburg Cottage Hospital | 7/2003-7/2008 |
| | Chairman Family Practice Department<br>Bronson Methodist Hospital | 6/1999-6/2001 |
| | Member, Blue Care Network<br>Pharmacy and Therapeutics Committee | 6/1998-6/2002 |
| | Member ,Board of Michigan Health Partners<br>(PHO) | 7/1995-6/2002 |
| | Chairman, Utilization Review<br>Westside Family Medical Center | 6/1994-9/2002 |
| | Member, Quality Assurance Committee<br>Westside Family Medical Center | 6/1994-9/2002 |

| | |
|---|---|
| Member, Pharmacy and Therapeutics Committee<br>Westside Family Medical Center | 6/1996-9/2002 |
| Member ,Pharmacy and Therapeutics Committee<br>Borgess Hospital | 6/1994-7/2000 |
| Member, Quality Assurance<br>Borgess Hospital | 6/1989-6/1997 |
| Quality Assurance Director<br>Family Practice Department<br>Borgess Hospital | 6/1989-6/1997 |
| Member Blue Care Network Utilization Committee | 7/1989-7/2002 |
| Member Quality Assurance Community<br>Borgess Hospital | 7/1985-7/1986<br>7/1989-7/1995 |
| Member Community Wide Cancer Committee | 3/1989-3/1991 |
| Chairman Pharmacy and Therapeutics<br>Community Hospital Watervliet | 6/1982-4/1984 |
| Member Emergency Room Committee<br>Community Hospital Watervliet | 6/1982-4/1986 |
| Secretary Medical Staff<br>Community Hospital Watervliet | 6/1982-4/1986 |
| Chairman Medical Review Committee<br>Community Hospital Watervliet | 6/1982-4/1986 |

**ACTIVITIES:**
(Continued)

| | |
|---|---|
| Chairman Quality Assurance Committee<br>Community Hospital Watervliet | 7/1983-7/1985 |
| Member ICU Committee<br>Community Hospital Watervliet | 7/1983-4/1986 |
| Chairman Emergency Room Committee<br>Community Hospital Watervliet | 7/1984-4/1986 |
| Vice President Medical Staff<br>Community Hospital Watervliet | 7/1984-4/1986 |

EXHIBIT A

Updated  2/3/2022

## HEALTH CARE ARBITRATION AGREEMENT

This Agreement is made on 4/16/2020, between Fred Huffstutler, of 30 Westminster Dr., Chatham, _____ Sangamon County, IL, ("*Patient*"), and Lewis Memorial Christian Village, of 3400 W. Washington, Springfield, IL, Sangamon

## RECITALS

(A) This Health Care Arbitration Agreement is not a condition to the rendering of health care services by any party;

(B) This Health Care Arbitration Agreement was executed by Patient as the recipient of health care services at the inception of or during the term of provision of services for a specific cause by Health Care Provider;

(C) This Health Care Arbitration Agreement does not and will not limit, impair, or waive any substantive rights or defenses of any party, including the statute of limitations;

(D) This Health Care Arbitration Agreement does not and will not limit, impair, or waive the procedural rights of any party to be heard, to present material evidence, to cross- examine witnesses, and to be represented by an attorney, or other procedural rights of due process of any party; and

(E) As a part of the discharge planning process, Patient or, if appropriate, members of Patient's family will be given a copy of this Health Care Arbitration Agreement previously executed by or for patient and will reaffirm it. Failure to comply with this requirement during the discharge planning process will void this Health Care Arbitration Agreement.

## SECTION ONE. SUBMISSION OF CLAIM TO BINDING ARBITRATION

In the event of any claim for damages arising out of (1) injuries alleged to have been received by Patient or (2) death of Patient, due to Health Care Provider negligence or other wrongful act, but not including intentional torts, the claim will be submitted to binding arbitration pursuant to the provisions of this Health Care Arbitration Agreement and the Federal Arbitration Act.

## SECTION TWO. SELECTION OF ARBITRATORS

Within 15 days after a party to this Agreement has given written notice of demand for arbitration to all other parties to this Agreement of a claim for damages arising out of (1) injuries alleged to have been received by Patient or (2) death of Patient, due to Health Care Provider negligence or other wrongful act, but not including intentional torts, the parties to this Agreement will each appoint an arbitrator and give notice of the appointment to the other. Within a reasonable time after notice has been given, the two arbitrators selected in this manner will select a neutral arbitrator and give notice of this selection to the parties. If the arbitrators selected by the parties cannot agree on the selection of a third neutral arbitrator, any party may apply to a court of competent jurisdiction for the selection of a third neutral arbitrator in accordance with the

provisions of the Federal Arbitration Act. The arbitrators will hold a hearing within a reasonable time from the date of notice of selection of the neutral arbitrator. The written notice of demand for arbitration must be accompanied by a statement of the claim and cause of action, which must be substantially in the form of a complaint under the Civil Practice Law of the State of Illinois. Service of the notice and statement may be by any method authorized for service of complaints under the Civil Practice Law or by mail.

## SECTION THREE. EXPENSES OF ARBITRATION

Expenses of the arbitration will be apportioned equally among all parties to this Agreement.

## SECTION FOUR. RIGHT OF CANCELLATION

This Health Care Arbitration Agreement may be cancelled by any signatory within 60 days of signing or 60 days after Patient's hospital discharge or 60 days after Patient's last medical treatment in relation to health care services not rendered during hospitalization.

## SECTION FIVE. ADDITIONAL PARTIES

By consent of all parties to an arbitration proceeding commenced under the provisions of this Agreement, a person, corporation, or entity not a signatory to this Agreement may be invited to participate in and be bound by this Agreement, or may be accepted into this Agreement upon an offer to participate and be bound. If an invitation or acceptance is made pursuant to consent of the arbitration parties, no signatory may refuse to arbitrate because of the participation of this additional party. An additional participant will execute a written statement to be bound by the arbitration proceedings and this Agreement or will sign this Agreement, and will then be treated as a party.

## SECTION SIX. EMPLOYEES

The employees of health care provider will be deemed to be parties to this Health Care Arbitration Agreement. No action at law may be brought by any party to this Agreement against Health Care Provider on the grounds of respondeat superior for the negligence or other wrongful act of any employee of Health Care Provider reasonably alleged to have caused the injuries on which Patient's claim is based.

## SECTION SEVEN. GOVERNING LAW

This Health Care Arbitration Agreement is subject to and will be governed by the provisions of the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*). In the event any provision of this Health Care Arbitration Agreement is inconsistent with any provision of the Federal Arbitration Act in effect on the date of execution of this Agreement, the Federal Arbitration Act will prevail over that provision.

In witness, the parties have executed this Agreement at Lewis Memorial Christian Village the date written above.

EXHIBIT A

## AGREEMENT TO ARBITRATE HEALTH CARE NEGLIGENCE CLAIMS NOTICE TO PATIENT

YOU CANNOT BE REQUIRED TO SIGN THIS AGREEMENT IN ORDER TO RECEIVE TREATMENT. BY SIGNING THIS AGREEMENT, YOUR RIGHT TO TRIAL BY A JURY OR A JUDGE IN A COURT WILL BE BARRED AS TO ANY DISPUTE RELATING TO INJURIES THAT MAY RESULT FROM NEGLIGENCE DURING YOUR TREATMENT OR CARE, AND WILL BE REPLACED BY AN ARBITRATION PROCEDURE.

THIS AGREEMENT MAY BE CANCELLED WITHIN 60 DAYS OF SIGNING OR 60 DAYS AFTER YOUR HOSPITAL DISCHARGE OR 60 DAYS AFTER YOUR LAST MEDICAL TREATMENT IN RELATION TO HEALTH CARE SERVICES NOT RENDERED DURING HOSPITALIZATION.

THIS AGREEMENT PROVIDES THAT ANY CLAIMS WHICH MAY ARISE OUT OF YOUR HEALTH CARE WILL BE SUBMITTED TO A PANEL OF ARBITRATORS, RATHER THAN TO A COURT FOR DETERMINATION. THIS AGREEMENT REQUIRES ALL PARTIES SIGNING IT TO ABIDE BY THE DECISION OF THE ARBITRATION PANEL.

<u>Fred Huffstutler</u>
Patient

_____
Health Care
Provider

## REAFFIRMATION OF AGREEMENT TO ARBITRATE HEALTH CARE CLAIMS

On the date indicated below, which is during the discharge planning process or is the time of discharge of the Patient named in the above Agreement, Patient or Patient's
<u>Fred Huffstutler</u> reaffirms the AGREEMENT TO ARBITRATE HEALTH CARE CLAIMS previously executed by or for patient, and acknowledges receipt of an executed copy of the AGREEMENT TO ARBITRATE HEALTH CARE CLAIMS so reaffirmed.

Dated: _____

_____
Patient

_____
Health Care Provider

QB\40341573.

EXHIBIT A

# Contract Between Resident and
## Lewis Memorial Christian Village
## Skilled Nursing Facility
## ADMISSION AGREEMENT

*No papers signed until 4/16/2020*

This Skilled Nursing Facility Admission Agreement (the **"Agreement"**) is made and entered into by the following individuals (the "Parties") on the day of 4/16/2020 (the **"Effective Date"**) by and between:

- Lewis Memorial Christian Village, henceforth referred to as the **"Community"**, and

- The resident: Fred Huffstutler, in addition to the following categories of individual(s) who shall be designated in the addendum set forth as **Exhibit A** to this Agreement:

  - Any individual(s) who qualify as a legal representative of the resident and who may exercise the resident's rights under this Agreement to the extent required or permitted by applicable law (**"Legal Representative"**); and

  - **"Responsible Party"** is an individual who has control and/or access to the Resident's income, assets and/or resources. The individual who signs this Agreement as the Responsible Party agrees to act on the resident's behalf and agrees to cause payment of fees and charges incurred by or on the resident's behalf from the resident's funds, assets or estate.

Prior to admission, resident shall provide Community with a copy of a written agreement between resident and any individuals who qualify as a Legal Representative which authorizes the individual to inspect and copy the resident's records and authorizes the resident's representative to execute the Agreement on behalf of the resident.

All such individuals (hereinafter, collectively referred to as the **"Resident"**) voluntarily consent to the admission of resident to the Community and authorize the Community to provide the services as outlined in this Agreement to the resident. These individuals shall be party to and execute a copy of this Agreement prior to the resident's admission to the Community.

In consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Community and the Resident agree to the following terms and conditions of this Agreement:

I.      **Term.**

The term of this Agreement shall commence on the Effective Date and shall remain in effect until this Agreement is terminated in accordance with Article X of this Agreement.

II.     **Applicable Requirements.**

This Agreement and all rights, duties and obligations of the Parties shall be governed by all applicable state and federal laws and regulations, third party payor requirements, and current policies, procedures, rules and regulations of the Community (collectively referred to as the **"Applicable Requirements"**). Resident acknowledges that a copy of the Community's policies, procedures, rules and regulations governing Resident and any visitor conduct in the Community has been given to Resident, in addition to a list of the current services offered with corresponding costs.

Such Community policies, procedures, rules and regulations may be amended from time to time, consistent with applicable law. Resident will be periodically informed in writing of any material changes in Community policies, procedures, rules, and regulations governing Resident and any visitor conduct in the Community. The Parties agree to comply with all such Applicable Requirements at all times during the term of this Agreement.

III.    **Admission.**

A.      **Preadmission Evaluation.**

The Community's decision to enter into this Agreement is based on the facts and information provided by or on behalf of the Resident during a preadmission evaluation for the purpose of confirming that the Community has the resources necessary to meet the Resident's medical, cognitive and psychosocial needs. Full disclosure of all details of the Resident's qualifications for admission to the Community is essential for the Community to render quality health care. If the Community determines, at any time following the Effective Date of this Agreement, that any facts or information obtained during the preadmission evaluation were falsified, misrepresented or otherwise withheld by or on behalf of the Resident, the Community may terminate this Agreement and arrange the necessary discharge or inter-facility transfer in accordance with Article X of this Agreement, consistent with Resident's transfer and discharge rights under federal and state law. The Community shall request a criminal history background check for the Resident within 24 hours of admission.

B.      **Resident Handbook.**

Prior to or upon admission, the Community shall provide the Resident with a current copy of the Community's Resident Handbook which shall include a written summary of all Resident rights and responsibilities. A copy of the Resident Rights is attached as **Exhibit B** to this Agreement. The Community

reserves the right to amend the Resident Handbook from time to time upon thirty (30) days prior written notice to the Resident. The Resident shall acknowledge receipt of the Resident Handbook and/or any amendments in writing. This Resident Handbook, and the Community's rules and regulations as they now exist and may be amended from time to time are incorporated and made a part of this Agreement.

C.   **Legal Representatives; Responsible Parties.**

Prior to admission and throughout the term of this Agreement, the Resident shall notify the Community, in writing, of:

i.   Any and all Legal Representatives of the Resident who shall act for or on behalf of the Resident in the exercise of certain rights, including but not limited to those related to health care decision-making and the release of the Resident's individually identifiable health information to the extent required or permitted by Applicable Requirements; and

ii.  Any and all Responsible Parties who, without the risk of incurring personal financial liability, may act for and on behalf of the Resident with regard to the proper access and disposition of the Resident's assets, property, income or resources, both while the Resident is living and after the Resident's death, for the purpose of fulfilling the Resident's financial duties and obligations under this Agreement to the extent required or permitted by Applicable Requirements.

The Parties agree to maintain a current list of all such Legal Representatives and Responsible Parties in **Exhibit A** to this Agreement, to require all such individuals to (a) execute a copy of this Agreement in fulfillment of their respective obligations on behalf of the Resident to the extent required or permitted by the Applicable Requirements, and (b) for the Resident to furnish the Community with accurate, complete and signed copies of all documents that confirm the appointment of all such Legal Representatives which the Resident authorizes the Community to rely on to the extent required or permitted by the Applicable Requirements. A copy of a Responsible Party Addendum to this Agreement is attached as **Exhibit C**.

IV.  **Accommodations, Attending Physician, and Services.**

A.   **Accommodations.**

The Community agrees to provide the Resident with basic accommodations (a bed, nightstand, reading lamp, chair and closet, collectively referred to as **"Accommodations"**) beginning on the commencement date designated in **Exhibit A** (the **"Commencement Date"**) and shall continue until this Agreement is terminated in accordance with Article X of this Agreement.

B.    **Attending Physician.**

Resident has the right to select his/her attending physician. Upon admission to the Community, the Resident shall engage the services of a duly licensed and qualified physician who shall be designated in **Exhibit A** and serve as the Resident's attending physician (the **"Physician"**) for the purpose of providing or otherwise arranging for all health care items and services required during the Resident's stay at the Community. The Community shall not provide the Resident with any medications, diagnostic tests, treatments, special diets or equipment without specific orders from the Physician. The Physician shall keep the Resident informed of the Resident's health and medical condition, and shall afford the Resident the opportunity to participate in the planning of total care and medical treatment, and/or to refuse treatment.

Any attending physician selected by Resident must comply with the Applicable Requirements, including the policies, rules, and regulations of the Community, and the federal and state rules and regulations governing physician activities in skilled nursing facilities. If the Physician, at any time, fails to act in accordance with the Applicable Requirements or is not otherwise available with reasonable notice to serve as the Resident's personal attending physician, the Community shall have the right, after consulting with the Resident and the Physician, to the extent possible, to seek alternate physician services from another duly licensed and qualified physician of the Community's choosing, including but not limited to the Community's designated medical director, consistent with the medical director's agreement with the Community.

C.    **Basic Services.**

The Community shall furnish the Accommodations and the common areas of the Community, as appropriate. Other basic services include, but are not limited to, 24-hour nursing care, diagnostic services, laboratory services, clinical photography, three meals per day plus snacks, activities, social service support, laundry, housekeeping, and maintenance. These services will be provided by the Community, as will those designated in **Exhibit D** to the Agreement (**"Basic Services"**).

D.    **Supplemental (Non-Health Care) Services.**

At the option and request of the Resident, the Community shall provide or otherwise arrange for certain supplemental non-health care services, not otherwise included in the Basic Services, to be available to the Resident on the Community's premises from time to time (**"Supplemental Services"**) (e.g., cable television, transportation, etc.). The Community, in its sole discretion, shall determine those employees and third party vendors who are authorized to provide Supplemental Services.   The Community shall maintain a current list of authorized third party vendors in the Community's business office.   Information regarding particular Supplemental Services and related fee schedules are available directly from the third party vendor, and are outlined as available in **Exhibit D** to the Agreement. The Community makes no warranties,

representations or other recommendations with regard to these third party vendors.

E.    **Supplemental Health Care Services.**

At the option and request of the Resident and/or as ordered by the Physician, as appropriate, the Community shall arrange for certain supplemental health care services, to be available to the Resident, whether on or off the Community's premises, from time to time (**"Supplemental Health Care Services"**). The Community, in its sole discretion, shall determine those health care providers authorized to provide Supplemental Health Care Services. The Community shall maintain a current list of authorized health care providers in the Community's business office. Although the Community is responsible for the quality and timeliness of these Supplemental Health Care Services, the Community makes no warranties, representations or other recommendations with regard to these independent providers' qualifications or expertise.

F.    **Level of Care.**

Resident's level of care is determined initially either prior to moving into the Community or according to the Applicable Requirements after taking into consideration Resident's abilities, desires, and needs. Resident's level of care can change at any time during the term of this Agreement. Resident needs will be reassessed periodically as required under the Applicable Requirements and at other times, as needed, to determine if a different level of care is needed. A different level of care will commence as soon as it is needed and Resident will be responsible for any increased fee associated with the increased level of care. All other terms of this Agreement will continue as agreed prior to the change in Resident's level of care needs.

All services provided by the Community will be in accordance with Resident's care plan as determined by Resident, Resident's Physician, and Resident's personal desires if consistent with medical advice or in keeping with a negotiated risk agreement, if necessary.

V.    **Resident Personal Property.**

Resident agrees to provide clothing and other personal items as needed or desired by the Resident. However, while the Community will exercise reasonable care for the protection of the Resident's property from loss or damage, the Community recommends that Resident not maintain any personal property items of any value in the Accommodations at any time. The Community shall not be responsible for the loss of any personal belongings (**"Resident Personal Property"**) owned by the Resident, or visitors, guests or invitees of Resident, unless delivered and placed in the custody of the Community for safekeeping and acknowledged by receipt.

Resident will provide a written inventory of Personal Property upon forms furnished by the Community prior to or upon admission. The Resident also agrees that

the Community will not manage, use, or dispose of any Personal Property of the Resident except with the written authorization of the Resident. At any time, the Community may require that items of exceptional value or which would convey unreasonable responsibilities on Community be removed from the premises of the Community for safekeeping.

## VI.    Resident Privacy Rights; Cameras and Video Equipment.

The Resident agrees that Resident, and any visitors, guests, or invitees of the Resident will respect and observe the privacy rights of all residents and staff of the Community. No Resident shall record the likeness or voice of any other resident or of any staff member by any means including, but not limited to-video recording, audio taping, and photography, without the consent of the Resident or staff member. No Resident, visitor, guest or invitee of the Resident shall install an electronic monitoring device in Resident's room or Community. Electronic monitoring device is defined to include a surveillance instrument with a fixed position video camera or an audio recording device, or a combination thereof, that is installed in a resident's room and broadcasts or records activity or sounds occurring in the room. [*Exception: Illinois Residents are permitted to install electronic monitoring devices, provided Resident complies with all requirements of the Illinois Authorized Electronic Monitoring in Long-Term Care Facilities Act (210 ILCS 32/5), including completion and submission of the required consent form prepared by the Illinois Department of Public Health.]*

## VII.    Financial Arrangements.

### A.    Basic Rate; Expenses.

The Resident agrees to pay the Community:

   i.    Upon execution of this Agreement the amount equal to the Resident's first (1st) full and any prior partial month's basic rate shown on **Exhibit D** (the **"Basic Rate"**) for all Basic Services, depending on the Resident's assigned level of care, provided by the Community;

   ii.    Every month thereafter, an amount equal to the Basic Rate for all Basic Services, depending on the Resident's then-current assigned level of care provided by the Community;

   iii.    The expense of any Supplemental Services that are properly requested, arranged by the Community and received by the Resident;

   iv.    Any expense billed to or incurred by the Community that is associated with any Supplemental Health Care Services that were received by the Resident and not otherwise covered, deemed medically necessary or otherwise reimbursed by a Federal health

care program or other third party payor, to the extent permitted by Applicable Requirements (Expenses and fees for Supplemental Services and Supplemental Health Care Services are collectively referred to as the **"Expenses"**); and

v.   Any co-payment or co-insurance and deductible specified in any plan of coverage by a Federal health care program or other third party payor in which the Resident is enrolled or for which the Resident is deemed eligible by an appropriate governmental agency.

If the Resident is not eligible for services paid for by a Federal health care program, Resident shall cooperate with Community for obtaining reimbursement from any applicable third party payor (e.g., insurance company, pension fund).

**B.    Changes in Basic Rate and Expenses.**

The Community shall notify the Resident, in writing, at least thirty (30) days in advance of any amendment in the Basic Rate or other Expenses during the term of this Agreement. The written notice shall become an addendum to the Agreement.

**C.    Monthly Statement; Payments.**

Taking into account the Basic Rate payments made pursuant to this Agreement, the Community will issue a monthly statement before the first (1st) day of each calendar month of the term itemizing any and all fees for Expenses incurred by the Resident during the prior month. All such Expenses are *due and payable in advance, without notice or demand, on the **seventh (7th) day of each month** of the term*. Resident agrees that payments shall be promptly made from the Resident's monthly resources from all sources (e.g., Social Security income, pension or retirement funds, annuities, insurance) for all applicable co-insurance, co-payment, deductibles, or any other amounts that are the responsibility of the Resident. All payments shall be paid at the Community's business office, unless the Community designates in writing a different address for payment purposes.

**D.    Increases in Fees and Charges.**

The Community reserves the right to change or increase the Basic Rate, Expenses or other charges due to the Community hereunder upon thirty (30) days prior written notice to the Resident.

**E.    Late Charges; Returned Check Charges.**

*[For Those Residents whose stay with the Community is not paid for by Medicaid]* The Resident will be charged a late fee in the amount of Fifty and No/100 Dollars ($50.00) if the monthly Basic Rate or Expenses are not paid in full by the *seventh (7th) day of any month*. An additional Fifty and No/100 Dollars ($50.00) fee will be assessed for each month a payment is due and not received

timely. Resident will be charged Twenty-Five and No/100 Dollars ($25.00) for each check returned by a bank due to insufficient funds or for an automatic withdrawal that is returned by a financial institution for any reason, including, but not limited to, insufficient funds or incompleteness. The acceptance by the Community of any Basic Rate or Expense payments after the due date shall not constitute a waiver of the Community's rights in the event of the Resident's failure to make such payments when due, or as herein prescribed and agreed, nor will it be considered as a change in the date upon which any such payments are due. The Community's failure to demand any Basic Rate or Expense payments when due shall not constitute a waiver by the Community, and the necessity of demand for payment when such payment is overdue is hereby waived.

F.      **Collection Costs.**

The Community shall institute reasonable collection efforts with regard to any past due amounts in accordance with Applicable Requirements. However, the Community will not accept responsibility for negotiating a settlement on any disputed claims or delinquent accounts hereunder. All such claims and accounts shall be transferred to the Community's collection agency in accordance with the Applicable Requirements. Any past due accounts transferred to the collection agency by the Community will be assessed a Thirty-Three and One Third Percent (33⅓ %) collection fee based upon the balance of the account and the Resident will be responsible for payment of all amounts due plus said collection fee. The Resident will also be responsible for all collection costs incurred by the Community, including reasonable attorneys' fees and expenses.

G.      **Non-Community and Supplemental Health Care Services.**

In addition to the Community's Basic Rate and Expenses charged to the Resident under Section VII(A) of this Agreement, the Resident shall be financially responsible for any and all other fees, expenses and other costs for any health care items or services that the Resident receives from a health care provider and that are not otherwise covered, deemed medically necessary or otherwise reimbursed by a Federal health care program or other third party payor, to the extent required or permitted by the Applicable Requirements.

H.      **Eligibility for Third-Party Payments.**

The Resident may be, or become, eligible to receive financial assistance, reimbursement, or other benefits from Federal health care programs (e.g., Medicare, Medicaid) and other third party payors, such as private insurance, employee benefit plans, managed care coverage, supplemental security income insurance, or old-age survivors' or disability insurance during the term of this Agreement. To the extent required or permitted by the Applicable Requirements, if the Resident is or becomes eligible to receive any such payments from any third parties related to Basic or Supplemental Health Care Services:

      i.      The Resident shall assign to the Community and shall take all

actions necessary for the Community to receive all such third party payments in order to reimburse the Community for any Services rendered to the Resident by the Community or to cover any related expenses incurred by the Community;  and

ii.   The Resident shall at all times cooperate fully with the Community and each third party payor to secure payment, thus requiring the Resident, when requested, to provide information, to sign and deliver documents, and to designate the Community as the Resident's representative payee for receipt of federal Social Security benefits or any other federal or state government assistance, reimbursement, or benefits to the extent all amounts due to the Community.

**I.**      **Medicare and Medicaid Program.**

i.   The Community currently participates in the Medicare and Medicaid programs. The Community reserves the right to withdraw from the Medicare or Medicaid programs at any time in accordance with the Applicable Requirements.

ii.   In accordance with the Applicable Requirements, the Resident, with the Community's instruction and assistance, as needed, shall take all steps necessary to apply (or reapply) for and receive Medicare, Medicaid and any other health care benefits or other financial assistance that may be available to the Resident at any time during the term of this Agreement and to notify the Community, in writing, of any such benefits or assistance.

iii.   At any time that the Resident becomes eligible for Medicaid benefits during the term of this Agreement, the Community shall inform the Resident, in writing, of those covered items and services for which the Resident is (and is not) financially responsible.

**J.**      **Resident Finances.**

The Resident is responsible for his/her personal funds and has the right to manage his/her personal funds. However, the Resident may authorize the Community, in writing, to maintain the Resident's personal funds in accordance with the Applicable Requirements. The Resident may, at any time, revoke the authorization by providing the Community with a written notice signed and dated by the Resident that allows a reasonable time frame for the Community to respond.

**K.**      **Resident Estate.**

If and when applicable, the Resident's estate shall be liable to and shall pay the Community an amount equal to any unpaid monthly Basic Rate,

Expenses or other amounts that are due and owing the Community pursuant to this Agreement. This provision and the responsibility of the Resident's estate shall survive any termination or other expiration of this Agreement.

**VIII.** **Resident Representations and Responsibilities.**

    **A.** **Purpose of Admission.**

The Resident agrees that the Accommodations are occupied by the Resident for residence purposes only and that the Accommodations shall be occupied only by the Resident named in this Agreement. The Resident further agrees that the Accommodations will not be used or allowed to be used for any unlawful purpose or for any purpose deemed by the Community or the Community's insurance agent to be hazardous due to fire or any other risk.

    **B.** **Health Care Notification.**

Prior to or upon admission, Resident will execute an authorization for the Community to communicate with any necessary health care providers on Resident's behalf related to the care and treatment of Resident at the Community, to the extent required or permitted by the Applicable Requirements.

    **C.** **Contents and/or Renters Insurance.**

The Resident acknowledges and agrees that the Resident is solely responsible for the purchase of the necessary contents or renters' insurance for the purpose of insuring any and all Resident Personal Property that the Resident may elect to maintain in the Accommodations. The Resident shall provide the Community with a current copy of all such insurance on or before the Commencement Date and at least annually thereafter.

    **D.** **Assumption of Risk.**

The Resident acknowledges and agrees that the Resident and any Legal Representatives designated in **Exhibit A** are responsible for the Resident's personal, financial, and health care decisions and maintaining the Resident's own health, personal property, liability, automobile (if applicable), and other insurance coverage in adequate amounts. The Resident acknowledges that the Community is not an insurer of the Resident's person or property. The Community shall not be responsible in any manner for the Resident when the Resident leaves the Community's premises. The Resident agrees to hold harmless the Community with respect to any deterioration in condition or accident that may occur while the Resident is away from the Community.

    **E.** **Indemnification.**

Resident hereby agrees to defend, indemnify, hold harmless, and release the Community and its agents from and against any and all liabilities, losses, costs, expenses, claims, suits, damages, injuries, awards, judgments, and/or

responsibilities whatsoever, including, without limitation, legal fees and costs, expert fees, and similar expenses, which may be asserted against, imposed upon, or incurred by the Community as a result of or related to:

    i.    Resident's failure to obtain, or from the failure of others to furnish, nursing, health care, or personal care services, and from all injury and damages which could have been avoided or reduced if such services had been obtained or furnished;

    ii.    Any acts committed by an independent third party provider providing Supplemental Health Care Services or Supplemental Services that directly or indirectly result in harm or injury to Resident, other residents or staff, or other individuals in or about the Community;

    iii.    Any injury or death to any person caused by Resident, or Resident's visitors, guests, or invitees;

    iv.    Any injury to property of others caused by Resident, or Resident's visitors, guests, or invitees;

    v.    Resident's negligence, intentional wrongdoing, or breach of Resident's contractual obligations;

    and

    vi.    Any use of durable medical equipment used by Resident whatsoever, including, without limitation, mobility devices, hospital beds, bed rails, wheelchairs, walkers, glasses, hearing aids, oxygen, etc..

Unless resulting solely from the Community or its agents' gross negligence or willful misconduct or unless such indemnification is prohibited by the Applicable Requirements.

In the event of any injuries to Resident, or Resident's visitors, guests, or invitees, or any damage to or loss of any property at your Accommodations or within the Community, Resident agrees to give the Community written notice of the injury, loss, or damage within five (5) days of its occurrence.

**F.**    **<u>Damage to Community or Accommodations.</u>**

The Resident is responsible for any damage to the Community or Accommodations' property caused by the Resident (or Resident's visitors, guests, or invitees) beyond normal wear and tear, and the Resident agrees to be financially responsible for all related repair and replacement of damaged property, based on the actual charge or cost to the Community for such repair and replacement, to the extent required or permitted by the Applicable Requirements.

IX.  **Intra-Community Transfers; Bed Hold Policy.**

The Community shall conduct any and all intra-Community transfers resulting in the Resident's movement to another location within the Community in accordance with the Applicable Requirements. If the Resident is temporarily absent from the Community by reason of illness, voluntarily for any reason, or for any other personal cause, the Applicable Requirements, including the Community's policies and procedures, including its Bed Hold Policy shall govern whether the Community shall continue to reserve the Resident's room during such temporary absence. If such room is reserved for the Resident, the Resident shall pay any applicable charges during such periods to the extent permitted by the Applicable Requirements.

X.  **Termination; Resident Death.**

A.  **Termination Resulting in Discharge or Inter-Community Transfer.**

The Community may not terminate this Agreement and must permit the Resident to remain in the Community and not discharge or transfer the Resident to another health care facility unless one or more of the following apply:

i.  The discharge or transfer is necessary for the Resident's welfare and the Resident's needs cannot be met by the Community;

ii.  The discharge or transfer is appropriate because the Resident's health has improved sufficiently so that the Resident no longer needs the Community's services;

iii.  The health, safety, or welfare of the Resident or other individuals in the Community are endangered by the Resident's physical presence;

iv.  The Resident has failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare, Medicaid or other health care benefit program) any and all services received by the Resident under this Agreement;

or

v.  The Community ceases to operate.

Except in the case of an emergency, prior to any such termination resulting in discharge or inter-community transfer, the Community must notify the Resident (including any Legal Representatives) the Physician, and certain other third parties, in writing at least thirty (30) days prior to the termination date. Notice must include all reasons and related arrangements in a language and manner understood by the Resident, all in accordance with the Applicable Requirements, including the Resident's Rights. If deemed an emergency by

Community, or Resident has not resided in the Community for at least thirty (30) days, notice to the same individuals must be made as soon as practicable.

The Resident also acknowledges and agrees that the Resident is entitled to exercise certain appeal and hearing rights, prior to any termination resulting in discharge or transfer to another facility, all in accordance with the Applicable Requirements.

A discharge from the Community or denial of admission or readmission shall not constitute a waiver of any other remedies available to the Community or the Resident.

A Resident may terminate the Agreement and all obligations under it with sufficient written notice as outlined in the Resident Handbook. No prior notice of termination of the Agreement shall be required, however, in the case of a Resident's death. No Resident shall be forced to remain at the Community against the Resident's will, nor shall any Resident remain in the Community beyond the time authorized by this Agreement and the Applicable Requirements.

All charges shall be prorated as of the date on which the Agreement terminates, and, if any payments have been made in advance, the excess shall be refunded to the Resident.

**B.**     **Resident Death.**

This Agreement shall terminate, in the event of the Resident's death, as of the first full day after all Resident Personal Property has been removed from the Community's premises.


**C.**     **Legal Representative Obligations.**

In the event of any termination resulting in discharge or inter-community transfer or Resident death, the Resident and all appointed Legal Representatives agree to cooperate with the Community in fulfilling all Resident duties and obligations in accordance with the Applicable Requirements, including but not limited to the following:

      i.    Relocating or transferring the Resident to the appropriate location, whether it be another Community location, or a hospital or other facility, as appropriate;

      ii.   Receiving and/or removing from the Community and certifying receipt of any and all of Resident Personal Property upon the Resident's discharge or transfer;

            and

       iii.    Making the necessary arrangements for funeral services and burial in the event of the Resident's death, when applicable.

**D.**    <u>Disposition and Storage.</u>

If any Resident Personal Property is not claimed or removed at the time of the Resident's discharge, inter-community transfer or death, the Community may immediately move and place the Resident Personal Property in proper storage until claimed. The Community is not responsible for any damages incurred to the Resident Personal Property if storage becomes necessary. The Resident or the Resident's estate shall be obligated to pay all costs of storage or disposition and shall bear the risk of loss or damage to any such Resident Personal Property. If the Resident Personal Property remains unclaimed for thirty (30) days thereafter, the Community shall accept the Resident Personal Property as a donation to the extent permitted by the Applicable Requirements.   This provision shall survive any termination or other expiration of this Agreement.

**XI.**    <u>Miscellaneous.</u>

**A.**    <u>Complaints and Grievances; Dispute Resolution.</u>

The Resident has the right to submit a complaint or grievance to the Community with respect to the actions or inactions of Community representatives, Community residents and other third parties. The Community has an obligation to initiate prompt efforts to resolve all Resident grievances and to effect the necessary corrective or other actions to the extent required or permitted by the Applicable Requirements. Resident may also file a complaint with the State survey and certification agency concerning issues such as Resident abuse, neglect, misappropriation of Resident property in the facility, or non-compliance with advance directives requirements.

**B.**    <u>Non-Discrimination.</u>

The Community shall protect and promote the rights of the Resident to the extent required by the Applicable Requirements, and the Community shall not discriminate on the basis of race, religion, color, national origin, sex, age, disability, marital status, sexual preference, or source of payment.

**C.**    <u>Assignment.</u>

Resident's rights and privileges under this Agreement are personal and non-transferable, and may not be assigned. The rights and obligations of the Community under this Agreement may be assigned to any other duly licensed and qualified person or entity but only to the extent permitted by the Applicable Requirements.

**D.      Binding Effect.**

This Agreement shall be in full force and effect and be binding upon and inure to the benefit of the Parties and their respective heirs, legatees, executors, representatives, successors, and permitted assigns, until terminated in accordance with this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer upon any person, other than the Parties, except as provided above, any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

**E.      Waiver.**

No waiver or failure to enforce any provision of this Agreement by any Party shall be effective unless the same is in writing and signed by the waiving Party.

**F.      Entire Agreement.**

This Agreement, the Resident Handbook, the Community's rules and regulations, and the Exhibits are incorporated herein by this reference. This Agreement and the documents incorporated herein by reference are the entire agreement between Resident and the Community, and may be amended only by a written instrument signed by Resident, and by an authorized representative of the Community. This Agreement supersedes all prior and contemporaneous understandings, commitments, representations, negotiations, discussions and agreements, whether oral or written, expressed or implied, between the Parties relating to the matters contemplated hereby, and constitutes the entire agreement between the Parties relating to the subject matter hereof.

**G.      Governing Law; Jurisdiction.**

This Agreement will be governed by and construed in accordance with the laws of the State where the Community is located, without reference to the choice of law principles thereof.

**H.      Severability.**

In case any one or more of the provisions, conditions, or covenants, or any portion thereof, contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, or the remaining portion thereof, but this Agreement shall be construed as if such invalid, illegal, or unenforceable provision, or portion thereof, had never been contained herein.

EXHIBIT A

**I.      Subordination.**

This Agreement and the Parties' rights hereunder will be subordinate to any ground lease, mortgage, or deed of trust now or hereafter placed upon or affecting the Community, but the Resident's right to remain in possession of the Resident's Accommodations will not be disturbed so long as the Resident complies with all of the provisions of this Agreement and is not in default under any provision of this Agreement.

**J.      Notice.**

All notices, requests, and other communications hereunder must be in writing and shall be given by personal delivery or mailing by regular mail, postage pre-paid, to the Resident and all Legal Representatives designated in **Exhibit A**, as appropriate.

**K.      Binding Arbitration.**

All disputes arising out of or relating *in any way* to this Agreement or to any of the Resident's stay at the Community SHALL BE RESOLVED BY BINDING ARBITRATION AND NOT BY A JUDGE OR JURY. A copy of an arbitration agreement has been contemporaneously provided to Resident.

**L.      Re-Admission Acknowledgement.**

*Resident agrees that all terms, conditions and consents in this Agreement shall be valid and binding upon Resident's re-admission to the Community, provided either the re-admission is within 30 days of the transfer or discharge OR as long as payment is made by or on behalf of Resident to hold the bed, in accordance with the Community's Bed Hold Policy.*

*Resident Initials:* _____ F.H.


*Legal Representative:* _____


*Responsible Party* (If Applicable)*:* _____ F.H.

**M.**     <u>Acknowledgement.</u>

Resident and any individuals identified in <u>*Exhibit A*</u> acknowledge that they have carefully read and understand the terms of this Agreement, that the terms have been explained to them by a representative of the Community, and that they have had an opportunity to ask questions.

Resident also understands that Resident has had the opportunity to consult with any family, friends, health care providers, and/or legal counsel about signing this Agreement; that Resident has the legal capacity and proper legal authority to understand and execute this Agreement; and that Resident is signing this Agreement voluntarily, without coercion or duress.

BY THEIR SIGNATURES, the Parties have executed this Agreement as of the date first above written.

Lewis Memorial Christian Village ("Community")

Signed:___*Kimberly Dawson*___

Witness:___*Kimberly Dawson*___

**("Resident")**

Signed:_____

Printed:_____

Witness:___*Kimberly Dawson*___

**("Legal Representative")**

Signed:_____

Printed:_____

Capacity:_____

Witness:___*Kimberly Dawson*___

**("Responsible Party") (if applicable)**

Signed:_____

Printed:_Fred Huffstutler___

Capacity:_____

Witness:___*Kimberly Dawson*___